Mary Margaret WARD, et al., Plaintiffs-Appellees, Cross-Appellants,

v.

SUCCESSION OF Richard W. FREEMAN, et al., Defendants-Appellants, Cross-Appellees.

No. 87–3182.

United States Court of Appeals, Fifth Circuit.

Sept. 15, 1988.

---

Lawrence R. Levin, Kenneth A. Grady, Vance L. Liebman, Damon E. Dunn, Sheri A. Young, Deborah G. Moore, Chicago, Ill., for Richard & Louis Freeman.

Curtis R. Boisfontaine, Sally A. Shushan, New Orleans, La., for Louisiana Coca-Cola Bottling Co.

Charles Thensted, Skye McLeod, John F. Whitney, New Orleans, La., for Succession of Richard W. Freeman.

Charles K. Reasonover, Robert E. Kerrigan, Jr., Michael R. Testerman, Duris L.

Holmes, David L. Campbell, Darrell K. Cherry, New Orleans, La., for plaintiffs-appellees, cross-appellants.

Before GEE, DAVIS and SMITH, Circuit Judges.

GEE, Circuit Judge:

This appeal concerns issues that arose in an action brought by shareholders against Louisiana Coca-Cola Bottling Company ("LA Coke") and its corporate officers. We reverse the district court's decision to compel disclosure of attorney-client communications and the ruling at trial that defendants waived their privilege in other communications. We also reverse the district court's directed verdict against defendants' prescription defense, vacate the judgment, and remand the case for a new trial.

*Facts and Proceedings Below*

This case arises from LA Coke's decision to redeem its outstanding stock in 1982 (the "1982 Tender"). LA Coke was a closely held Louisiana corporation engaged in the bottling and sale of soft drinks in southeastern Louisiana. Several shareholders holding an aggregate total of less than four percent (4%) of outstanding shares in the corporation decided to redeem their shares at the offering price of $850.00 per share. This stock redemption occurred two years after the company had redeemed shares for $321.57 per share from two families holding twenty-eight percent (28%) of the outstanding shares. A year after the 1982 Tender, the company again redeemed some of its stock in a third tender offer and repurchased a large bloc of its outstanding shares from an institutional shareholder. As a result of the three tenders and several other stock transactions, defendants' ownership interest in LA Coke increased from 20% to 86% between 1979 and 1983. At the end of 1984, the Coca-Cola Company ("Big

Coke") offered to buy LA Coke for $148,-000,000.[1]

After learning of the lucrative sale to Big Coke, plaintiffs (the "Ward Parties") sought counsel and instituted this action against LA Coke, Richard Freeman Jr., Louis Freeman, and the Succession of Richard Freeman. Before discussing the course of the trial proceedings, we sketch a summary of how the parties view the sequence of transactions that led to the 1984 sale to Big Coke.

In 1979, the Freemans attended a convention of Coca-Cola bottlers where Big Coke announced its plan to engage in a bottler restructuring program whereby Big Coke would "actively participate" in changes of bottler ownership. Soon thereafter, LA Coke began to redeem its shares. Plaintiffs view the several individual redemptions and the three successive tender offers in 1980, 1982, and 1983 as part of a calculated plan by the Freemans to acquire over eighty percent (80%) of LA Coke's stock with the intent to sell the company for a windfall profit to Big Coke. LA Coke discontinued dividends in the latter half of 1981 (for the first time in the company's history) and contemplated a reverse stock split to reduce the number of shareholders in the corporation. Plaintiffs suggest that these actions constituted part of the Freemans' plans to "squeeze out" and "freeze out" the minority shareholders.

The defendants, on the other hand, characterize the stock redemptions as a response to shareholder requests for liquidity and an opportunity to unify management and ownership interests so as to promote flexibility in giving the business new direction. From the defendants' perspective, the early 1980's were difficult years for LA Coke. After a decade of turbulence in the bottling industry caused by huge increases in the costs of raw materials, increases in · interest rates, and new competition spawned by new products, LA Coke found itself foreclosed from growth in its historic territory because of its already high market share. To maintain its competitive position in a market where it offered ten products in fifteen containers (resulting in approximately 100 different product-package choices), LA Coke sought expansion through acquisition. The company's decision to suspend its attempt to purchase the Lake Charles Coca-Cola bottler (because of unexpected liabilities attached to the purchase) left the company with a $30 million credit line. LA Coke characterizes 1981 as an unsettling year, with sugar experiencing dramatic price fluctuations and the "Pepsi Challenge" (resulting in record promotional costs and discounting by Pepsi) forcing LA Coke to respond with a number of high-cost promotions. Thus, LA Coke suspended dividends in the latter half of the year.

Having the line of credit at its disposal, LA Coke prepared the 1982 Tender. The 1982 Tender document provided detailed information regarding LA Coke's financial and business condition. The Tender statement noted that the directors were considering a reverse stock split proposal to present to shareholders for a vote at an "unspecified future date" but that there "are no current plans for such a reverse split." The directors disclosed that they did not intend to sell their own shares, and thus that their percentage ownership in LA Coke would increase. The directors did not make recommendations about whether other shareholders would sell, instead urging each shareholder "to consult with his financial advisor in evaluating this offer."

Six months before trial, the district judge compelled LA Coke to disclose its attorney-client communications to plaintiffs. At trial, the district judge determined that the defendants had waived their privilege in other communications, giving rise to evidence heavily relied upon by plaintiffs to prove fraud. The district judge also sub-

---

1. This purchase price reflected a two to three time increase in the value of the company over that reflected in the per share price paid in the 1982 Tender. We quickly note, however, that the value of a closely held corporation as a whole does not reflect the value of its minority shares. *Sommers Drug Stores Co. Employee* *Profit Sharing Trust v. Corrigan Enters., Inc.,* 793 F.2d 1456, 1462 (5th Cir.1986). Further, the "true value" of a closely held corporation is, at best, a subjective guess; and directors need not disclose their opinions on the "true value" of a corporation. *Kademian v. Ladish Co.,* 792 F.2d 614, 626 (7th Cir.1986).

mitted a list of numerous charges to the jury in order to clarify the alleged misrepresentations and omissions that gave rise to plaintiffs' claims. The disclosure of the attorney-client communications and the propriety of the charges sent to the jury are the main sources of dispute in this appeal.

*Issues on Appeal*

*1. Attorney-Client Privilege*

LA Coke contends that the district court erroneously compelled the disclosure of communications between LA Coke's managers and attorneys regarding the 1982 Tender. In 1970, we held that in litigation involving a corporation and its shareholders, the shareholders may have access to otherwise privileged information · after a showing of good cause. *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970), *cert. denied* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed. 2d 323 (1971). Recognizing that the beneficiaries of a corporate managements' actions are the corporation's shareholders, we found a sufficient mutuality of interest between management and shareholders in communications with attorneys to bar any assertion by management alone of an absolute privilege against the shareholders. 430 F.2d at 1101. We did not attempt in *Garner,* however, to prevent entirely managements' assertion of the privilege against shareholders.

> The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

430 F.2d at 1103–1104.

*Garner* set forth a non-exclusive list of indicia that "may contribute to the decision of presence or absence of good cause."

> [T]he number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and · the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

430 F.2d at 1104.

LA Coke attacks the district court's application of *Garner* on both extension and good cause grounds. First, LA Coke contends that as a matter of law the *Garner* holding does not extend to alleged violations of securities and fraud laws arising from tender offers because of the lack of mutual corporate, management, and shareholder interests when shares are being redeemed. Managers of a tendering corporation must seek to conserve assets by not over-paying for redeemed stock; shareholders wishing to redeem, however, are naturally interested in obtaining the highest price they can get. Shareholders redeem their stock voluntarily, based upon whether the price being offered is satisfactory to them individually. Valuing a closed corporation for purposes of redeeming its stock is a difficult task because the mutual interest commonly shared between management and stockholders partially unravels: some shareholders and managers will elect redemption and others will not, as each consults his own self interest.

To support its "lack of mutuality" argument, LA Coke points to one sentence in the *Garner* opinion that, taken in isolation, could suggest that *Garner* recognizes the limited circumstances its mutuality of inter-

est rationale covers: "There may be many situations in which the corporate entity or its management, or both, have interests adverse to those of some or all stockholders." In *Garner*, we specifically elected, however, to open up to shareholders (who demonstrate good cause) communications between management and counsel where some pecuniary interests are necessarily adverse. In more complete form, we stated:

> There may be many situations in which the corporate entity or its management, or both, have interests adverse to those of some or all stockholders. But when all is said and done management is not managing for itself.
>
> The representative and the represented have a mutuality of interest in the representative's freely seeking advice when needed and putting it to use when received. This is not to say that management does not have allowable judgment in putting advice to use. But management judgment must stand on its merits, not behind an ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is, at least in part, exercised.

430 F.2d at 1101.[2]

Thus, although the mutuality of interest test does extend to tender offer situations, it is clear that *Garner* did *not* establish an absolute exception to the attorney-client privilege rule. "The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders." 403 F.2d at 1103. We elected not to open all communications to the casually interested shareholders for policy reasons that merit restatement here: stockholders may wish to use the communications to "second-guess or even harass [management] in matters purely of judgment," resulting in a deterioration of can-

did attorney-client communication. 430 F.2d at 1101.

Defendants suggest that because of the threat of shareholder harassment management will prefer not to confer with counsel, thus sacrificing that which the privilege is intended to encourage—effective corporate management. Defendants point to the Supreme Court's discussion of this concern in *Upjohn Co. v. United States*, 449 U.S. 383, 393, 101 S.Ct. 677, 66 L.Ed.2d 584, 593 (1981):

> But if the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.

Despite its attractive articulation of the fragility of the attorney-client privilege, *Upjohn* does not undermine our holding in *Garner*. In *Upjohn*, the IRS sought disclosure of communications between a company's employees and its corporate counsel. The case focused upon the traditional circumstance of an outside party seeking disclosure of privileged communications. The entire thrust of *Garner* was, however, to recognize that shareholders stand in the shoes of a client when management seeks counsel on matters that ultimately should benefit shareholder interests. The *Garner* court decided to preserve the privilege against shareholder harassment but to suspend it in circumstances where shareholders "show cause why it should not be invoked in the particular instance." 430 F.2d at 1104. We turn now to defendants' second concern regarding the privilege issue: the indicia that guide our courts in making the good cause determination.

Defendants contend that the district court clearly erred in accepting the magistrate's finding that plaintiffs had shown

---

**2.** We have held that no "mutuality of interest" exists between shareholders and management when management seeks counsel in matters that give rise to the work product privilege. For example, where an SEC investigation of a corporation's illegal payments to foreign nationals triggers an internal investigation by the corporation's counsel, we have held that the "mutuality of interest" is destroyed because of the "sufficient anticipation of litigation." *In re International Systems & Controls Corporation Securities Litigation*, 693 F.2d 1235, 1239 (5th Cir.1982).

good cause for suspending the privilege. We agree. The good cause indicia (which we have listed above) must be weighed in light of the type of claim asserted. Where plaintiffs bring a derivative claim against management for actions in which there are no adverse interests, then the strength of plaintiffs' "bona fides" may allow for a finding of good cause even though other factors are marginally demonstrated. A non-derivative suit by shareholders against management actions that necessarily arise from some adverse interests (e.g. disclosures related to a tender offer) presents more problems for finding good cause.

■ The Ninth Circuit has held that *Garner* applies to shareholder derivative suits only. *See Weil v. Investment/Indicators Research & Management,* 647 F.2d 18 (9th Cir.1981). Under *Weil,* the factors in the *Garner* good cause index are not even considered unless the suit is derivative in nature. We have rejected the Ninth Circuit's narrow interpretation of the types of suits covered by *Garner,* see *In re International Systems & Controls Corporation Securities Litigation,* 693 F.2d 1235, 1239 n. 1 (5th Cir.1982); but we recognize reason in the *Weil* holding: Where shareholders bring a successful derivative action on behalf of the corporation, they benefit *all* shareholders. Where, however, shareholders seek to recover damages from the corporation for themselves, they do not even seek a gain for all others. In the latter circumstance, the motivations behind the suit are more suspect, and thus more subject to careful scrutiny, in determining if good cause for suspending the privilege exists.

This case has little of the appeal of a derivative suit. Here, plaintiffs discovered that the company had been sold *three years* after redemption of their stock for a much greater value than they thought it had in 1982. Anyone even casually familiar with the intense competition in most industries in our economy knows, however, that the value of a company can change dramatically in three years—or, for that matter, in three months. A single decision by management can mean boom or bust in a short period of time for even the largest company. Plaintiffs seek recovery for alleged illegal activities connected with the redemption of stock, where interests are adverse because of the individual preferences and valuation methods associated with redemptions by a closed corporation.

■ Turning to other pertinent factors listed in *Garner,* we see even less reason for finding good cause. Plaintiffs cumulatively owned less than four (4%) of the stock in LA Coke at the time of the 1982 Tender. Furthermore, as we shall see, many of the court's charges to the jury described actions that were not violations of securities laws. Finally, we find that plaintiffs made no effort to obtain information about the 1982 Tender from other non-privileged sources. Plaintiffs simply state that the communications were not available from any other source. Although the attorney-client communications were not publicly available, the information presented in them may have been known by other corporate employees or contained in other business documents. *See In re LTV Sec. Litig.,* 89 F.R.D. 595, 608 (N.D.Tex.1981). Plaintiffs cannot simply assert that the information was unavailable and expect that unsupported assertion to satisfy the requirement that they show good cause.

■ The Ward Parties argue that the magistrate's finding of good cause is supported by their need to have information proving scienter on the part of the defendants. Defendants refer to an order issued by the district judge in another case involving the 1983 Tender. In that case, the district judge noted that "[s]ince disclosure of the communication is necessary to prove scienter, an essential element of the plaintiffs' case, plaintiffs have met their burden of showing good cause." Plaintiffs are mistaken in assuming that having a scienter element as part of one's burden of proof is a sufficient showing of "apparent necessity ... [for] having the information" under *Garner.* Scienter must be proven in every securities fraud case, but that fact alone is not sufficient for showing "good cause." Otherwise, all fraud claims would pry open the privilege for shareholder in-

dulgence. *Garner* clearly requires more. Because plaintiffs have failed to demonstrate good cause from other pertinent *Garner* criteria, we hold that the privileged communications related to the 1982 Tender should not have been disclosed.

The above resolution of the *Garner* issue does not, however, dispose of all matters related to privileged communications. At trial, the district court ruled that the corporation had waived its privilege as to communications not covered by the *Garner* ruling when it introduced a new issue into the trial: the affirmative defense of reliance on the advice of counsel. Several days after the district court issued its *Garner* ruling, it proposed and signed a protective order (the "1986 Protective Order") preserving LA Coke's right to appeal the *Garner* order. One provision of the 1986 Protective Order stated:

> Disclosure of Privileged Information after the Court has ordered disclosure of attorney-client materials in a subject matter shall not be a waiver of the attorney-client privilege for that subject matter and the disclosing party's right to appeal any order for disclosure is hereby specifically preserved.

Plaintiffs took advantage of the *Garner* ruling in much of their ensuing discovery, subpoenaing documents and testimony related to the 1982 Tender from LA Coke's attorneys and law firms. In addition, they accompanied their responses to pre-trial motions with many privileged communications. Facing the certain prospect of plaintiffs' use of privileged communications at trial, defendants naturally prepared a response to plaintiffs' allegations by also using evidence from the communications. By the time the parties submitted the pre-trial order, memoranda, and jury charges to the court, it was clear that the plaintiffs would be using the privileged communications at trial.

Based on these circumstances, the plaintiffs assert that the defendants claimed a reliance-on-advice-of-counsel defense in the pre-trial order, memoranda, and jury charges, thus waiving their privilege in previously undisclosed communications. Defendants contend that plaintiffs had already injected issues regarding advice of counsel into the trial through their response to motions and questioning of LA Coke counsel during depositions. LA Coke faced a dilemma: if it failed to list its lawyers as "may call" witnesses in the Pre-Trial Order or did not submit a proposed jury charge discussing its good faith in relying on advice of counsel (thus negating the element of scienter in the 10b–5 claim), then it risked not adequately defending itself against plaintiffs' use of the privileged communications at trial; on the other hand, in listing the witnesses and jury charge it risked an adverse waiver ruling by the district judge for injecting a reliance-on-counsel defense into the trial. In fact, the waiver ruling came more than half-way through the trial, near the close of plaintiffs' case.[3] After plaintiffs' direct examination of two LA Coke attorneys, defendants examined the attorneys, taking care to limit all inquiry strictly to matters disclosed under the 1986 Protective Order. At this the trial judge issued his waiver ruling, concluding that the defendants had voluntarily injected a "new issue" into the trial and thus had waived their privilege in communications occurring after June 15, 1982 that related to both the 1982 and 1983 Tenders. This ruling does not square with traditional notions of when a party acts *voluntarily* in introducing privileged matter so as to waive the privilege.

The district court held that *Panter v. Marshall Field & Co.*, 80 F.R.D. 718 (N.D. Ill.1978) controls the application of waiver law to the facts in this case. *Panter* states the general rule regarding waiver, long-recognized in our courts:

> Where . . . a party asserts as an essential element of his defense reliance upon the advice of counsel, we believe the party waives the attorney-client privilege with respect to all communications, whether written or oral, to or from counsel con-

---

3. Defendants properly entered a continuing objection at trial to all use of the privileged com-

munications that the trial judge permitted under *Garner*.

cerning the transactions for which counsel's advice was sought. 80 F.R.D. at 721. In *Panter*, a class of shareholders brought suits against Marshall Field's, its directors, and certain corporate officers when they refused to accept a tender offer by Carter Hawley Hale. Defendants themselves initially raised reliance-on-advice-of-counsel as a defense in their answers to interrogatories and deposition testimony. The district court, noting defendants' "heavy reliance" on the defense in the interrogatories and depositions, 80 F.R.D. at 720, concluded that the defendants had waived the privilege.

■ Our case is easily distinguished from *Panter*. LA Coke never mentioned the defense until after issuance of the *Garner* ruling and the 1986 Protective Order, and the defendants never raised it at trial until after the plaintiffs had introduced privileged communications there regarding advice of counsel.[4] The issue that controls our inquiry is whether the defendants *voluntarily* injected a reliance-on-advice-of-counsel issue into the trial. The defendants contend that all references to reliance on counsel in the Pre-Trial Order and cross-examination of its attorneys at trial were made for the purpose of rebutting the plaintiffs' attempts to prove the defendants' knowledge of its illegal actions. The plaintiffs characterize the references as injecting an affirmative defense, and thus a voluntary introduction of privileged infor-

mation into the trial for the defendants' own benefit. No cases touch upon the precise issue raised in this appeal: where a district court has compelled disclosure of privileged communications that the plaintiffs use at trial to prove the defendants' scienter, do the defendants automatically waive their privilege by attempting to use those same communications to demonstrate their good faith reliance on counsel's advice? On reason and authority, we think not.[5]

The defendants cite *In re Burlington Northern, Inc.*, 822 F.2d 518 (5th Cir.1987), for the proposition that a defendant does not waive his privilege by using privileged communications to negate claims raised by the plaintiff when it is the plaintiff "who seeks to rely on attorney-client communications and work product to prove its claim." 822 F.2d at 533. In *Burlington*, the plaintiff company had sued numerous railroad companies for conspiring to prevent construction of a pipeline by filing and defending lawsuits. The suits raised an aspect of the familiar antitrust *Noerr-Pennington* doctrine, where an antitrust defendant may successfully defend against a claim of anticompetitive behavior arising from litigious or petitioning activities by proving his genuine intent to influence governmental action in undertaking the activities. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and

---

4. The Ward Parties first introduced evidence regarding advice of counsel in the following direct examination of an LA Coke attorney:

> Q. And based on your meeting that you had with Mr. Freeman on—what's that date, January 13th—he is of a mind to use a reverse stock split to get shareholders. Is that correct?
>
> * * * * * *
>
> A. It says if there is one.
> Q. If there is one. And then the next sentence Mr. Wolfe, in your presence, advises him that the company might have, under a Delaware line of cases holding that a reverse split may be unlawful if it is effected without valid corporate business reason and in a way that it is unfair to the frozen out minority—
> A. Right.
> Q. And Mr. Freeman, on January 13th, 1982, understood that, didn't he?

> A. He understood that, but he understood a lot more than that.
> Q. But he understood that fact?
> A. That's not a fact. That's legal advice, and this is a summary of legal advice.

5. We do not overlook the argument made by the defendants that the 1986 Protective Order controls this issue. Despite the authority cited by the defendants for the proposition that disclosures made under the aegis of a protective order do not constitute a waiver, *Transamerica Computer Co. v. IBM Corp.*, 573 F.2d 646 (9th Cir. 1978), the 1986 Protective Order was limited to the defendants' disclosure of communications in discovery and did not extend to the defendants' use of those communications at trial. The defendants properly entered a continuing objection at trial to the plaintiffs' use of the disclosed communications, and thus the defendants' waiver problem is limited to the issue as we have stated it above.

*United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

Although much of the focus in *Burlington* was upon the interaction of the *Noerr-Pennington* doctrine with the "crime or fraud" exception to the privilege, the court did address the problem of whether a defendant who relies on *Noerr-Pennington*—and thus injects into the case the issue of his good faith—waives his privilege to communications related to that issue. Our court held that no waiver occurred:

> We cannot accept the proposition that a defendant in an antitrust suit who relies on the protection afforded by *Noerr-Pennington* necessarily gives up the right to keep his communications with his attorney confidential. Such a rule certainly cannot be justified on the basis of waiver. This is not a case in which a party has asserted a claim or defense that explicitly relies on the existence or absence of the very communications for which he claims a privilege.... A defendant who relies on *Noerr-Pennington* merely denies the existence of an antitrust violaton.... Accordingly, a plaintiff attempting to make an antitrust case based on conduct that involves lobbying or litigation bears the burden to show that such activity is not protected petitioning but a sham.... We do not see how it can be said that the railroads waived their privilege when it is ETSI who filed this lawsuit and who seeks to ruly on attorney-client communications and work product to prove its claim.

*In re Burlington Northern, Inc.,* 822 F.2d at 533. LA Coke argues that *Burlington* closely parallels this case: here, the plaintiffs employed privileged communications to prove scienter, and the defendants employed the same material to demonstrate their lack of it. As the defendants put it, their "scienter response constituted an outright denial of any 'evil intent' and not an admission of reckless conduct justified by reliance on the advice of counsel."

We find much merit in defendants' argument. LA Coke was not the first party to inject reliance on advice of counsel into the trial. The plaintiffs first argued that the advice given by LA Coke's attorneys to the defendants regarding disclosure decisions went straight to the crucial issue of whether the allegedly fraudulent decisions were made with scienter. LA Coke had no choice but to negate the proof by showing it acted in good faith and without any knowledge of an evil plot to defraud shareholders. Echoing the holding in *Burlington,* we do not see how LA Coke can be said to have waived its privilege when it was plaintiffs who exploited the attorney-client communications in order to attempt to prove their claims.

Another case cited by defendants supports our holding. *See Lorenz v. Valley Forge Ins. Co.,* 815 F.2d 1095 (7th Cir. 1987). In *Lorenz,* the Seventh Circuit stated that "[t]o waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations." 815 F.2d 1098. The plaintiffs in *Lorenz* had contended that the defendant insurer acted in bad faith in failing to pay a valid claim. The insurer denied the allegation and offered its former attorney's testimony to show that a settlement offer had been made. Plaintiffs moved for disclosure. The magistrate concluded that the defendant had waived the attorney-client privilege by voluntarily injecting into the case the issue of its good faith during settlement negotiations and by listing its former attorney as a witness in the pre-trial order. The Seventh Circuit reversed, finding that the settlement offer was "merely a new form of evidence to counter an issue injected by the plaintiffs." *Id.* Although *Lorenz* dealt with a rebuttal of bad faith allegations, we find that LA Coke's use of *Garner* communications to rebut the plaintiffs' fraud allegations similarly grew out of an issue injected into the trial by the plaintiffs.

█ Finally, the plaintiffs urge us to hold that the district judge abused his discretion when he did not find that the crime-fraud exception to the attorney-client privilege applies here. Plaintiffs strenuously assert that "defendants clearly perpetuated

a fraud through the use of their attorneys." Mere allegations of fraud are not, however, sufficient to break the privilege. *Shirvani v. Capital Investing Corp.*, 112 F.R.D. 389, 391 (D.Conn.1986). The party challenging the privilege must (1) make an independent prima facie case that a crime has been committed, and (2) then demonstrate that the privileged information bears a relationship to the alleged crime or fraud. *In Re International Systems & Controls Corp., etc.*, 693 F.2d 1235, 1243 (5th Cir. 1982). The plaintiffs fail the first test: As a matter of law, tender offers and reverse stock splits are legal. The fraudulent scheme repeatedly referred to by the plaintiffs was not supported by evidence presented to the district court. The plaintiffs maintain that the privileged documents contain such evidence, but they too point to nothing in them avowing or advancing such a scheme. We find no abuse of discretion in the trial judge's disposal of this issue.

### 2. Substantive Actions

At trial, plaintiffs contended that the defendants violated federal securities and RICO laws, the Louisiana Blue Sky Law, and various state laws related to fraud, negligence and breach of fiduciary duty. After a seven week trial, a jury found that the defendants had committed fraud, breached their fiduciary duties, and violated federal securities laws. The defendants appeal each of these verdicts.

### A. The Rule 10b–5 Claim

To prevail under Rule 10b–5, a plaintiff must establish a misstatement or an omission of a material fact, made with scienter, on which the plaintiff relied after exercising due diligence and which proximately caused the plaintiff's injury. 15 U.S.C. § 78a *et seq.* (1982). The Ward Parties' Rule 10b–5 claim depended on twenty-nine purported misrepresentations and omissions related to the 1982 Tender (the "29 Charges"). The defendants maintain that the 29 Charges were fundamentally flawed in that they contained a mixed bag of non-actionable allegations. The trial judge submitted the charges to the jury generally, although conceding that none of them might be actionable.

The defendants discuss each of the 29 Charges in detail in their briefs. We need only determine whether some of the charges fail to qualify as violations of Rule 10b–5. Where we cannot determine whether or not the jury based its verdict on non-actionable allegations of omissions or misrepresentations, it is familiar law that we must reverse. In *Radol v. Thomas*, 772 F.2d 244 (6th Cir.1985), the Sixth Circuit held that sending a preliminary asset appraisal to a jury for a determination of materiality was error. Recognizing that there was no duty to disclose the appraisal, the court stated:

> Even with the correct instructions on materiality, sending the issue to the jury on the basis of an incorrect application of the test for materiality introduces great uncertainty regarding a particular jury's view of "substantial likelihood," and under our decisions, the District Court should have ruled that the reports were not material and removed the issue from the jury.

772 F.2d at 253. In our Circuit, we have addressed this same problem in the context of a general submission of fraud charges to a jury:

> Because the use of the general verdict form required appellees to prove fraud under all of their theories but they failed to prove all elements of at least one, we reverse the judgment that appellants practiced common law fraud.

*Ratner v. Sioux Natural Gas Corp.*, 770 F.2d 512, 519 (5th Cir.1985) (where appellees failed to prove at least one of six fraud allegations submitted to the jury). Although a general verdict can stand "where it is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it," *Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir.1984), we cannot determine which of the 29 Charges the jury relied upon in finding a violation of Rule 10b–5.

Before we examine several of the non-actionable charges, it is helpful to restate the

plaintiffs' theory of the case. After reading in the Wall Street Journal in 1985 that LA Coke sold out to Big Coke for a large sum, the plaintiffs surmised that in 1982 the defendants had a secret plan to obtain an eighty percent (80%) equity interest in the company and then sell the company to Big Coke. An important allegation in the plaintiffs' case is that the company was worth much more in 1982 than the price paid for redeemed shares in the 1982 Tender would reflect, but that this fact could not have been known by the plaintiffs until after the sale to Big Coke at the end of 1984. The Ward Parties' theory of the case depended on the legal validity of the 29 Charges. The trial judge never ruled on whether *any* of these charges stated a cause of action. The defendants argue that the 29 Charges contain only allegations based upon the defendants' personal motives, subjective beliefs or deductions arrived at from public information, a substantial number of which are clearly non-actionable as a matter of law. We need not scrutinize each charge; under *Ratner*, we look to see whether one or several erroneous submissions could have significantly influenced the jury's verdict.

The defendants contend that numerous charges inquired about their personal motives rather than material facts about LA Coke's operations. Case law clearly holds that a defendant's motive is not a material "fact." This rule has been discussed at length in cases following the Supreme Court's ruling in *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (holding that breach of a fiduciary duty, absent any element of deception or manipulation, does not state a Rule 10b–5 claim). *See e.g., Augenstein v. McCormick & Co.*, 581 F.Supp. 452, 457–58 (D.Md.1984) (surveying cases). Specifically, the defendants argue that Charges 5 and 17, alleging respectively that the Freemans failed to disclose that they "had a plan to acquire eighty percent of Louisiana Coke's stock" and "wanted to form a Subchapter S corporation," were not "material facts." These charges concern supposed features of the alleged "secret plan" that the plaintiffs challenge in this suit. Sever-

al cases support the defendants' contention. In *Biesenbach v. Guenther*, 588 F.2d 400 (3d Cir.1978), the Third Circuit ruled that the directors' failure to disclose "the true purpose behind" their activities (i.e. to gain control of a corporation) failed to state a claim. Similarly, the failure of directors to disclose their plan to entrench themselves in office by means of a tender is not actionable. *Coronet Ins. Co. v. Seyfarth*, 665 F.Supp. 661 (N.D.Ill.1987). *See also Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482 (D.Del.1984). In *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214 (9th Cir.1980), the Ninth Circuit held that approval of a stock redemption enabling corporate officers to increase their control of a corporation did not run afoul of securities laws, even assuming that directors had such a plan:

> Any tender offer or acquisition by a company of its own stock obviously would reduce the number of outstanding shares and increase the proportionate control and earnings of all shareholders who retained their stock (not just the control and earnings of the directors). It is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market. *Alabama Farm Bureau Mutual Casualty Co., Inc. v. American Fidelity Life Ins. Co.*, 606 F.2d 602, 611 (5th Cir.1979). Nor is it necessarily a violation of the securities law to have a plan to make a stock acquisition with such a result, unless the plan includes practices that are intended to mislead or to defraud investors. *Id.* at 612–14; *Nelson v. Serwold*, 576 F.2d 1332 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

628 F.2d at 1220.

The plaintiffs cite no cases in which an entrenchment motive alone is held actionable, and thus Charge 17 is clearly improper. Although impure deeds or omissions that enable defendants to implement a plan are said in *Vaughn* to constitute actionable "facts," no such deeds or omissions are

alleged in Charge 5. Standing alone, Charge 5 is also flawed.

The plaintiffs contend that case law recognizes a cause of action for failure to disclose one's future plans. One case cited supports the assertion we make above that the proper focus is upon a material omission of a fact that allows a defendant to implement his alleged plan. In *Siebel v. Scott*, 725 F.2d 995 (5th Cir.), *cert denied* 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823 (1984), a general partner in a limited partnership persuaded seven limited partners to sell their interests. The general partner led each plaintiff "to believe that each was the sole remaining partner who had not yet agreed to sell his partnership interest," and controverted evidence led the district court to find that the defendant *failed to inform* the plaintiffs of certain lease rights they held. 725 F.2d 998.

In a brief reference affirming the district court's findings, the court noted that the general partner "deliberately misrepresented the options available to the limited partners, misrepresented his *planned use* of the cable television assets should the partnership terminate, and falsely represented to several limited partners that each was the last one deciding to sell out to JSA." 725 F.2d at 1000 (emphasis added). Presumably the defendant misrepresented his "planned use" of the assets by saying he "would need to install an earth receiving station." 725 F.2d at 997. Nowhere in the opinion is to be found an acceptance of the Ward Parties' proposition asserted here: that a director must *disclose* an entrenchment motive. The *Siebel* case holding does not discuss the materiality of Scott's secret plan to purchase the cable television system from the first partnership and then to sell the same assets at windfall profits to a second partnership. Presumably Scott had begun secret negotiations for the later sale or had taken other misleading steps that would constitute actionable "facts." The opinion is unclear because the main issue was the amount of damages granted, not whether the district court's findings of

fraud were based on non-actionable omissions.

Plaintiffs also cite a Ninth Circuit case in which a defendant failed to disclose that a secret "control group" had acquired a majority interest in the company with plans to make it a marketable entity and to sell it. *Nelson v. Serwold*, 576 F.2d 1332 (9th Cir. 1978). The Ninth Circuit has distinguished *Nelson* from the duty of corporate officials to disclose their motives for approving a stock redemption program.[6] Accordingly, *Nelson* does not conflict with our ruling regarding the legally immaterial status of Charge 5.

Our treatment of Charge 5 sinks Charge 6. The plaintiffs allege "[t]hat there was a plan to 'freeze out' or 'squeeze out' the minority shareholder." As the defendants state, Charge 6 "merely recharacterizes the '80% plan' charge with more inflammatory adjectives." In *Kas v. Financial Gen. Bankshares, Inc.*, 617 F.Supp. 288, 289–90 (D.D.C.1985), *aff'd*, 796 F.2d 508 (D.C.Cir. 1986), the district court ruled that the alleged "freeze out" involved only a failure by defendants "to disclose presumed intentions and schemes and [does] not involve information which would be material...." Because Charge 6 does nothing more than raise the specter of the defendants' impure motives, it is not actionable under Rule 10b–5.

 The defendants also argue that the first four of the 29 Charges are non-actionable. The four charges all challenge non-disclosure of what the defendants contend was public information:

(1) That Big Coke had embarked on its restructuring program;

(2) That acquisitions of bottlers had increased tremendously between 1979 and 1982;

(3) That the Soft Drink Interbrand Competition Act was passed in 1980;

(4) That the price of the stock of bottlers had been increasing substantially between 1979 and 1982.

---

**6.** We quote at (p. 791) the passage from *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980) in which the Ninth Circuit limits the *Nel-*

*son* ruling to situations where officers have implemented "practices that are intended to mislead or to defraud investors."

The trial judge instructed the jury that the "defendants did not have a duty to disclose to the plaintiffs information in the public domain to which the plaintiffs and defendants had equal access." The defendants challenge this statement, both as a misstatement of the law and as too general, failing to clarify properly to a jury what is legally meant by being in the "public domain." We need not decide, however, whether the limiting instruction constituted reversible error. It is clear that Charges 3 and 4 are as a matter of law in the public domain, *Johnson v. Wiggs*, 443 F.2d 803 (5th Cir.1971); and thus they should have never been submitted to the jury regardless of any limiting instruction. The jurors may have found Charges 1 and 2 not to be in the public domain; they are not actionable, however, because directors have no duty to disclose acquisitions in the industry (whether publicly known or not) that are not related to the transaction for which disclosure is being made. *See Mendell v. Greenburg*, 612 F.Supp. 1543, 1551 (S.D.N.Y.1985); *Gans v. Filmways, Inc.*, 453 F.Supp. 1116 (E.D.Pa.1978), *aff'd*, 595 F.2d 1212 (3d Cir.1979).

The plaintiffs argue that any harm caused by including Charges 1 and 2 was cured by a specific instruction to the jury: "In order for you to find that the refranchising or restructuring program, if any, of Big Coke was material at the time the plaintiffs sold their stock in Louisiana Coke, you must find by a preponderance of the evidence that at the time the plaintiffs sold their stock, (A) either the Freemans intended to sell Louisiana Coke to Big Coke, or it was probable that they would do so and (B) acquisition of Louisiana Coke seemed reasonably assured." This instruction does not suffice for two reasons: First, it does not in any way limit the duty implied in Charge 2. The Ward Parties at trial discussed bottler transactions in which Big Coke played no part. The law is clear that defendants had no duty to disclose those transactions. Second, the legal standard set forth in the instruction is incorrect. Before an acquisition activity can rise to the level of materiality in our Circuit, it must involve negotiations between the defendant company and another company. *Compare Susquehanna Corp. v. Pan Am. Sulphur Co.*, 423 F.2d 1075 (5th Cir. 1970) (potential negotiations misleading to disclose) *with SEC v. Mize*, 615 F.2d 1046, 1055 (5th Cir.), *cert. denied* 449 U.S. 901, 101 S.Ct. 271, 66 L.Ed.2d 131 (1980) (where "proposed course of action has reached a stage of probability ... negotiations concerning the proposed action must be disclosed"). Because Big Coke did not open discussions with LA Coke until 1984, it was improper to submit Charge 1 to the jury.

Finally, Charge 7 was immaterial. The 1982 Tender statement disclosed: "preliminary indications are that the results of the Company's operations for the fiscal quarter ending April 24, 1982 will be excellent." The 1982 Tender was issued before the end of the quarter, and thus it properly characterized the quarter's earnings. Charge 7 suggests that it was material that the Tender statement did not say earnings "were in fact excellent." An immaterial addition to disclosed facts is not actionable, and clearly Charge 7 was immaterial.

### B. The State-Law Fraud Claim

The plaintiffs' state-law fraud verdict must be vacated as well. The plaintiffs attempted to prove fraud based on the misrepresentations and omissions asserted in the 29 Charges. We have discussed the fundamental flaws in several of those charges; with no indication of where the jury based the finding of a securities law violation by the defendants, it is impossible to evaluate the fraud verdict. Further, because our ruling on the attorney-client privilege reverses the district court's decision to compel disclosure of material that may have led to several of the alleged material omissions, we must vacate the fraud verdict.

### C. The Fiduciary Duty Claim

Although the fiduciary duty verdict must be vacated under our attorney-client privilege and general verdict rulings, we address briefly two errors the district court made in its fiduciary duty instruction

to the jury.[7] The jury instruction stated in pertinent part:

> A fiduciary relation is one of trust and confidence, which makes it incumbent upon the officers and directors of a corporation to carry out their duties to the shareholders in good faith and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions *as if they were handling their own affairs.* Thus, a fiduciary may not take even the *slightest advantage* and is bound not to act in antagonism, opposition or conflict with the interest of the principal to the *slightest extent.* An officer or director of a corporation cannot be held liable for errors of judgment when he was acting with reasonable care, without corrupt intent, and in good faith. (emphasis added).

Plaintiffs concede that the "slightest conflict of interest" standard should not have been included in the instruction. Directors who own stock in a corporation have inherent conflicts of interests with shareholders, especially when deciding to redeem stocks. Because Louisiana allows directors to own stock in corporations they oversee and to approve stock redemptions for those corporations, the "slightest conflict of interest" standard injected in the fiduciary duty instruction was clear error.

The defendants contend that the instruction sets forth a "rigorous scrutiny" standard that is inappropriate in cases where no self-dealing has occurred. We agree. The trial court applied the strict standard of fiduciary duty which obtains when a director engages in a transaction with the corporation, grafting the self-dealing standard ("as if they were handling their own affairs") onto an otherwise proper standard governing the non self-dealing conduct of a corporate director ("carry out their duties to the shareholders in good faith and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions").

The self-dealing standard arises from LSA–R.S. 12:84 and was properly applied in *Noe v. Roussel,* 310 So.2d 806 (La.1975) (where a defendant liquidator acted on both sides of a transaction by both selling and buying the principal's property). The plaintiffs assert that the trial court properly relied on *Noe* here, maintaining that the "rigorous scrutiny" standard should apply because the Freemans were "interested" in the 1982 Tender. The Freemans could not have been "interested," however, unless they derived a personal benefit from the transaction which did not devolve upon the corporation or all stockholders generally. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984). The district court's reliance on the *Noe* "rigorous scrutiny" standard was misplaced.

### 3. Prescription

■ We come now to an issue that usually precedes consideration of all other issues: the time bar placed on securities and fraud actions in Louisiana.[8] We address prescription here because it is tied to the trial court's improper submission of non-actionable charges to the jury.

The district court directed a verdict against the defendants on their affirmative defense of prescription (limitations) despite considerable record evidence raising serious questions about what knowledge the plaintiffs had in 1982 about specific "material omissions" listed in the 29 Charges. For example, the record shows that at least one plaintiff was aware in 1982 of Big Coke's major bottler transactions and of an industry-wide "consolidation" of bottlers;

---

7. Fiduciary duty liability is not, of course, limited to actions that violate the federal securities laws. The fiduciary duty charge, however, predicated liability on the 29 Charges when it stated: "Plaintiffs allege that defendants breached their fiduciary duty to plaintiffs because they failed to disclose or misrepresented to plaintiffs a material fact or facts concerning the 1982 Tender Offer."

8. This issue does not affect any action for breach of fiduciary duty, as that prescriptive period in Louisiana is ten years. The federal securities law claims have a two-year period and the state law fraud claims must be brought within a year of notice.

that others were advised that the defendants "may be trying to squeeze out the minority shareholders' through a reverse stock split; that another thought in 1982 that "the stockholder officers were liable to charges of self-dealing;" and that *all* of them knew that the Freemans' percentage ownership increased as the plaintiffs cashed out. As the defendants note, this knowledge alone covers almost all aspects of the "fraud" alleged in Charges 1 to 6. Despite all of this evidence—which even the Ward Parties recognized raised a fact issue as to prescription—the trial judge directed a verdict *against* defendants on the issue.

We have previously discussed flaws in Charges 1 to 6. Because all of them lack materiality as a matter of law, the defendants need not prove a limitations defense to them. On remand of this action, however, the district court should consider carefully the evidence presented by defendants regarding the time at which the plaintiffs had inquiry notice of each alleged fraudulent act. The district court supported its directed verdict by stating "that a reasonable person would not have been inquiring [about fraudulent acts] and that the first inquiry that the plaintiffs should have done something they did do something, namely the newspaper articles which came to their attention in early January of '85." The implication in the ruling is that the sale to Big Coke or other acts misrepresenting or failing to disclose the value of LA Coke are the basis of the plaintiffs' cause of action. Except for the Charges discussed above, we do not now review the merits of the allegations plaintiffs made below.

### 4. Other Issues

Defendants also ask us to determine which, if any, of the 29 Charges fails to establish a claim under the federal securities laws. Although we entertain serious reservations about many of the Charges that we have not discussed, our holdings are limited to the improper submission of non-actionable charges to a jury rendering a *general* verdict. By not scrutinizing the remaining Charges, we do not by implication find them actionable. Defendants may

therefore continue to raise all objections to them that they have raised to us. Nor need we decide various other issues raised, such as the submission of laches and estoppel defenses to the jury, hearsay rulings at trial, the prejudice resulting from evidence introduced in closing arguments, and the plaintiffs' cross-appeal regarding prejudgment interest.

### Conclusion

Our decision today is limited. We set aside the verdicts rendered against the defendants and remand this case for retrial. Our determination that the plaintiffs failed to demonstrate good cause for suspending LA Coke's attorney-client privilege is limited to the facts presented in this case. Problems are presented when we must decide the privilege issue on a case by case basis. Left with many indicia for evaluating when to compel disclosure, our courts' unpredictable decisions will leave corporate officers less willing to discuss matters openly with the corporation's attorneys. That consequence is one which we deplore, but one that necessarily follows from *Garner*.

We REVERSE the district court's *Garner*, waiver and prescription rulings, VACATE the judgment, and REMAND for a new trial.