RAMBUS, INC., Plaintiff,

v.

INFINEON TECHNOLOGIES
AG, et al., Defendants.

No. CIV. 3:00CV524.

United States District Court,
E.D. Virginia,
Richmond Division.

March 17, 2004.

---

6. *See* footnote (1), *supra*.

Michael W. Smith, Esquire, Craig T. Merritt, Esquire, R. Braxton Hill, Esquire, Christian & Barton, L.L.P., Richmond, VA, Gregory P. Stone, Esquire, Peter A. Detre, Esquire, Munger, Tolles & Olson LLP, Los Angeles, CA, for Plaintiff.

Brian C. Riopelle, Esquire, Robert M. Tyler, Esquire, McGuire Woods, LLP, Richmond, VA, John M. Desmarais, Esquire, Gregory S. Arovas, Esquire, Michael P. Stadnick, Esquire, Kirkland & Ellis, New York City, for Defendants.

## ORDER

PAYNE, District Judge.

Having reviewed Plaintiff's Motion for Stay of the Ordering Provisions of the Second Paragraph of the Court's February 26, 2004 Order and the response thereto, and having concluded that it was erroneous: (1) to have referred on pages 59 and 60 of Section IIB of the Memorandum Opinion issued herein on February 26, 2004 (Docket No. 535) (the "February 26 Opinion") to *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146 (D.S.C.1974); (2) to have mentioned the concept of a "control group" in analyzing the issue of wavier; or (3) to have

considered, on pages 63 and 64 of the February 26 Opinion distribution of the document retention policy within Rambus; and having concluded that the bifurcated treatment given to the issue of subject matter waiver in the February 26 Opinion is not in the interests of judicial efficiency considering that an *in camera* review is currently underway on a related issue, it is hereby ORDERED that the February 26 Opinion and the Order implementing it (Docket No. 536) are vacated and that the Amended Memorandum Opinion and Amended Order issued herewith shall be filed to replace them.

It is further ORDERED that Plaintiff's Motion for Stay of the Ordering Provisions of the Second Paragraph of the Court's February 26, 2004 Order is hereby DENIED AS MOOT without prejudice to the filing of a motion for stay of any subsequent order issued following completion of the pending *in camera* review of privileged documents. It is further ORDERED that oral argument on the motion for stay set for March 26, 2004 at 2:00 p.m. is cancelled; but the Court will hear oral argument on Rambus' Motion to Dismiss (Rule 12(b)(6)) or, in the Alternative, for Partial Summary Judgment (Rule 56(b)) Concerning Infineon's Counterclaim Count 15, Based on California Bus. & Prof.Code § 17200 at that time.

The Clerk is directed to send a copy of this Order to all counsel of record by facsimile and regular mail.

It is so ORDERED.

## AMENDED MEMORANDUM OPINION

This matter is before the Court on two motions of the Defendants, Infineon Technologies AG, Infineon Technologies North America Corporation, and Infineon Technologies Holding North America Inc. (hereinafter collectively "Infineon") to compel the production of various documents the Plaintiff, Rambus, Inc. ("Rambus"), is withholding on the basis of the attorney-client and work product privileges. *See* Docket Nos. 490 and 492. For the reasons, and to the extent explained below, the motions are granted in part, de-

nied in part, and retained under consideration in part.

## STATEMENT OF FACTS

Rambus develops and licenses technologies to companies that manufacture semiconductor memory devices. Rambus does not manufacture any such devices itself; rather, it relies on licensing its patent portfolio for revenue. In 1990, Rambus filed United States Patent Application Serial Number 07/510,898 with claims directed to a computer memory technology known as Dynamic Random Access Memory ("DRAM"). The United States Patent and Trademark Office ("PTO") determined that this application covered several independent inventions and thus issued an eleven-way restriction requirement requiring Rambus to elect one invention to pursue in its application. In response, Rambus filed numerous divisional and continuation applications based on its original application, at least thirty-one of which have issued. These patents are directed to Rambus DRAMs ("RDRAMs"), Synchronous Dynamic Random Access Memory ("SDRAM"), and Double Data Rate Synchronous Dynamic Random Access Memory ("DDR–SDRAM").[1]

## I. General Background of the Litigation

On August 8, 2000, Rambus brought this action against Infineon, alleging infringement of several DRAM-technology related patents. *Rambus, Inc. v. Infineon Tech. AG*, 145 F.Supp.2d 721, 722 (E.D.Va.2001). In response, Infineon raised numerous affirmative defenses and asserted several counterclaims, some of which related to Rambus' interaction with the Joint Electronics Devices Engineering Council ("JEDEC"), an industry standard-setting body of which Rambus was a member from December 1991 to June 1996. *See Rambus, Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1084–86 (Fed.Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 227, 157 L.Ed.2d 135 (2003).

Before trial, an opinion was issued pursuant to *Markman v. Westview Instrs. Inc.*, 52

---

1. These technologies are described in some detail at *Rambus, Inc. v. Infineon Tech. AG*, 164

F.Supp.2d 743, 747–48 (E.D.Va.2001).

F.3d 967 (Fed.Cir.1995) (en banc), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), construing the disputed claim terms of the patents-in-suit. Thereafter, Rambus abandoned, before trial, the charge of infringement as to one of the patents-in-suit. After the presentation of the remainder of Rambus' infringement case, judgment as a matter of law ("JMOL") was granted in Infineon's favor on the remaining patents-in-suit, thereby making it unnecessary for Infineon to proceed on several of its affirmative defenses and counterclaims. Infineon's counterclaim for fraud was tried to a jury which found Rambus liable on Infineon's counterclaim for actual and constructive fraud. This Court, however, granted Rambus' post-trial motion for JMOL as to the constructive fraud claim and as to that part of the actual fraud verdict related to the DDR–SDRAM standard of JEDEC. *Rambus, Inc. v. Infineon Tech. AG,* 164 F.Supp.2d 743, 767 (E.D.Va.2001). Rambus' motion for JMOL as to the SDRAM standard was denied and judgment was entered on that verdict.

On appeal, a divided panel of the United States Court of Appeals for the Federal Circuit affirmed in part and reversed in part. *Rambus, Inc.,* 318 F.3d at 1106. Respecting the actual fraud verdict, the majority held that the JEDEC patent disclosure policy applied only to patent claims that reasonably read on or covered the standard under consideration by JEDEC and that, although Rambus wanted to obtain claims covering SDRAM standards, it did not in fact obtain any SDRAM patent claims while it was a JEDEC member. *Rambus, Inc.,* 318 F.3d at 1103–04. In reaching this conclusion, the Federal Circuit stated that:

> The record shows that Rambus's claimed technology did not fall within the JEDEC disclosure duty. The record shows at most that Rambus wanted to obtain claims covering the SDRAM instead. Some of that evidence does not put Rambus in the best light. Rambus thought it could cover the SDRAM standard and tried to do so while a member of an open standards-setting committee. While such actions impeach

Rambus's business ethics, the record does not contain substantial evidence that Rambus breached its duty under the EIA/JEDEC policy.

*Id.* at 1104. The Federal Circuit remanded the case to this Court to "reconsider infringement" in light of its decision respecting claim construction. *Id.* at 1095.

It is useful to understand the issues to be tried on remand. To begin, there will be a trial on Rambus' claims that Infineon has infringed Claim 26 of U.S. Patent 5,954,804, Claims 1 and 2 of U.S. Patent 5,953,263, and Claim 18 of U.S. Patent 6,034,918. *See* Transcript of Hearing, January 8, 2004, at 39–59 (hereinafter "1/8/04 Tr."). With but two exceptions, all of Infineon's affirmative defenses will be tried.[2] Thus, the trial on remand will involve the defenses of non-infringement, patent misuse, estoppel, laches, laches in the PTO, unclean hands, invalidity due to indefiniteness, and inequitable conduct in the procurement of the patents-in-suit. Some of these affirmative defenses will be supported, in part, with evidence about Rambus' conduct as respects JEDEC, but none depend entirely on such evidence.

With the exception of Counts 1, 2, 4, and 12, none of Infineon's original counterclaims remain in the case. 1/8/04 Tr., at 67–101. Count 12 alleges monopolization in violation of the Sherman Act, 15 U.S.C. § 2. This monopolization counterclaim alleges that Rambus has acquired monopoly power in the market for DRAM technology and the market for the DRAM's themselves. According to the counterclaim, Rambus allegedly acquired the monopoly power by a number of means, including intentionally not citing prior art and misleading the PTO to secure patents on DRAM technology that is covered by JEDEC standards, manipulating JEDEC and acquiring information from JEDEC to achieve these results, asserting and litigating unlawfully obtained patents against the entire DRAM industry, and engaging in other predatory, anticompetitive, and exclusionary conduct.

---

**2.** Infineon will not proceed with the following affirmative defenses: unenforceability due to

waiver and implied license.

Recently, the Court granted Infineon's motion to amend to add another counterclaim, Count 15, which alleges that Rambus has violated California's unfair competition statute, Cal. Bus. & Prof.Code § 17200. *Rambus, Inc. v. Infineon Tech. AG*, 304 F.Supp.2d 812, No. 3:00cv524, 2004 WL 326194 (E.D.Va. Feb.18, 2004). Count 15 incorporates by reference much of the alleged misconduct that is the predicate for Count 12, the monopolization claim.[3] But, the unfair competition counterclaim goes beyond the allegations of the monopolization count. Considered as a whole, Count 15 alleges that Rambus' monopolistic scheme, its manipulative and bad faith participation in the JEDEC-standard setting process, its spoliation of documents as a key ingredient for planned patent litigation, and its deliberate misconduct in DRAM-related litigation is actionable as unfair competition under the California statute.

## II. Background of the Motions to Compel

Shortly before the close of fact discovery in the initial proceedings, the Court granted in part Infineon's motion to compel Rambus to produce documents and testimony under the so-called "crime/fraud exception" to the attorney-client privilege. *Rambus, Inc. v. Infineon Tech. AG*, 155 F.Supp.2d 668, 680 (E.D.Va.2001); *see generally Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir.1999) (discussing "crime/fraud exception" to attorney-client privilege). In particular, by Order entered on March 7, 2001 (the "March 7 Order"), the Court concluded that Infineon had made out a prima facie showing that Rambus had devised and implemented a fraudulent scheme, that Rambus had communicated with counsel in furtherance of the scheme, and that these communications bore a close relationship to the fraudulent scheme.

The Court, therefore, ordered Rambus to disclose documents respecting the legal advice provided to Rambus pertaining to its disclosure of patents and patent applications to JEDEC, the JEDEC patent disclosure policy, efforts by Rambus to broaden its patents to cover matters pertaining to JEDEC standards, and the preparation of Rambus' June 17, 1996 withdrawal letter from JEDEC.

Rambus sought review of the March 7 Order by filing a Petition for Mandamus in the Federal Circuit. The appellate court denied the petition. Rambus, however, did not seek review of the March 7 Order on its direct appeal at the end of the initial proceedings in this Court.

Following remand,[4] a status conference was convened on October 31, 2003 for the purpose of planning for the trial. In that conference, Infineon represented that, in proceedings involving Micron Technologies, Inc. ("Micron"), Hynix Semiconductor, Inc. ("Hynix"), and the Federal Trade Commission ("FTC"),[5] Rambus had produced a substantial quantity of documents that should have been produced in this action, but were not. Rambus acknowledged that some of the documents produced in these proceedings should have been produced in this action, but that others should not have been. Infineon urged that Rambus' failure to produce those documents was more litigation misconduct[6] of the kind Rambus already had been found to have committed and, therefore, Infineon sought an order requiring immediate production of the documents. In response, Rambus urged that the reason for non-production lay in the difference between the documents requests in this case and those in the other cases. To ascertain the facts relevant to resolution of what could have been a significant failure to produce documents in the initial stage of this

---

3. Some, but certainly not all, of the incorporated allegations are of little, if any, efficacy by virtue of the decision of the Federal Circuit on Infineon's fraud counterclaims.

4. The matter was stayed while the Supreme Court of the United States considered Infineon's Petition for a Writ of Certiorari. The high court denied Infineon's Petition on October 6, 2003. *Infineon Tech. AG v. Rambus, Inc.*, —— U.S. ——, 124 S.Ct. 227, 157 L.Ed.2d 135 (2003) (mem.).

5. These litigations involve the patents-in-suit here and many of the same issues that are presented in this action.

6. *See Rambus, Inc. v. Infineon Tech. AG*, 155 F.Supp.2d 668, 680–83 (E.D.Va.2001). The finding of litigation misconduct was undisturbed on appeal to the Federal Circuit.

case, the Court entered an Order on November 5, 2003 (the "November 5 Order"). The Order required the parties:

> to review all requests for production of documents previously served herein by the other party and any rulings made by the Court thereon and, not later than December 1, 2003, to produce [to the other side] copies of all documents (as to which no attorney-client privilege is claimed) production of which had been previously requested but which had not been previously produced.

The November 5 Order also ordered the parties to serve "a list of documents as to which attorney-client privilege is claimed for such previously requested, but not produced, documents," and to serve a "memorandum in support of any privilege claimed." During a conference call respecting this Order, the Court instructed the parties that the privilege list and memorandum must be "very fulsome" and sufficiently specific to allow the adversary to file a meaningful motion to compel. The November 5 Order also established a briefing schedule, ordering that any motions to compel production of any allegedly privileged documents be filed by January 5, 2004.

In response to the November 5 Order, Rambus produced to Infineon approximately thirty boxes of previously requested, but not previously produced, documents. Then, on December 15, 2003, Rambus served what purported to be the privilege list required by the November 5 Order, listing nearly 3,000 allegedly privileged documents—2,300 more documents than Rambus claimed as privileged in the original proceedings in this Court. Along with this list, Rambus filed a three-page memorandum explaining in the most general terms the basis for the privileges asserted. A review of the list discloses that Rambus is withholding from production on claims of privilege an unascertainable quantity of documents that admittedly fall within the reach of the March 7 Order that were produced to Micron, Hynix, and the FTC but have not been produced to Infineon.

Rambus also is refusing to produce twenty-seven documents that admittedly fall within the scope of the March 7 Order that have never been produced to anyone, assertedly because of their belated discovery.[7] The reason given for so doing was that the Federal Circuit's opinion rendered the March 7 Order a nullity and that, therefore, Rambus need not produce those twenty-seven documents.

That brings us to Infineon's Motion to Compel Production of Documents Listed on Rambus' Privilege Log. *See* Docket No. 490. Infineon bases this motion to compel on three separate grounds. First, Infineon contends that many entries on Rambus' privilege log are insufficient and, that by filing an insufficient privilege log, Rambus has waived its claims of privilege as to the inadequately described documents. Second, Infineon argues that, by voluntarily producing some of the documents in parallel litigations, Rambus has waived any claim of privilege as to those documents. Finally, Infineon argues that Rambus must produce the twenty-seven documents listed on the privilege log that fall within the reach of the March 7 Order, but which, according to Rambus, were not previously produced in this action or in the parallel cases by virtue of simple inadvertence.

The second matter currently under consideration is Infineon's Motion to Compel Production of Documents and Testimony Relating to Rambus' Document Retention, Collection, and Production. *See* Docket No. 492. By this motion, Infineon seeks to have Rambus produce documents that describe and relate to the development and implementation of Rambus' document retention program, which, says Infineon, Rambus used to destroy documents pertinent to the issues in this action, notwithstanding that, at the time of the document destruction, Rambus anticipated litigation with DRAM manufacturers over Rambus' portfolio of patents. In other words, Infineon has accused Rambus of spoliation and, therefore, asserts that the crime/fraud exception to the attorney-client and work product privileges compels the disclosure of these documents. In addition, In-

---

7. Rambus has not disclosed when these documents were discovered or why it was so late in locating them.

fineon argues that, by disclosing (through depositions and document discovery) the substantive contours and components of its document retention policy and by testifying about the asserted reasons for its implementation and how it was implemented, Rambus has waived any claim of privilege as to any documents discussing the subject of the document retention program, including why it was adopted and how it was implemented. Infineon, therefore, moves to compel production of all documents pertinent to these issues.

## DISCUSSION

### I. Infineon's Motion to Compel Production of Documents Listed on Rambus' Privilege Log

This motion is directed to documents listed on the privilege log filed by Rambus on December 15, 2003 pursuant to the directive of the November 5 Order to: (1) produce documents previously requested, but not produced in, the original proceedings leading to the first trial; and (2) list any such documents that are not produced because a privilege is claimed. Specifically Infineon's motion calls for an order compelling production of:

(1) Approximately one-hundred documents (listed by privilege log number) and other entries that likewise do not identify an attorney sender or receiver in which the claim of privilege is based;

(2) Several hundred documents (listed by privilege log number) and other entries that do not specify that client confidences were communicated to a lawyer for the purpose of legal advice;

(3) Approximately twenty documents (listed by privilege log number) and other entries that likewise claim work-product immunity but do not specify that they were prepared by an attorney in anticipation of litigation;

(4) All documents on the privilege list that previously have been produced in parallel litigation with Hynix and/or the FTC; and

(5) The twenty-seven listed documents that are covered by the March 7 Order but were not produced because Rambus asserts that the Federal Circuit's opinion renders the March 7 Order null and void.

Infineon grounds its request for the compelled production of Categories (1) through (3) on the inadequacy of Rambus' privilege log. Infineon grounds its request for the compelled production of Category (4) in a waiver argument. Infineon seeks the compelled production of Category (5) based on its disagreement with the position taken by Rambus respecting the effect of the Federal Circuit's opinion.

### A. The Adequacy of Rambus' Privilege Log and Whether, in Filing an Insufficient Log, Rambus Waived its Privileges

Rambus has withheld production of the otherwise discoverable materials in Categories (1) through (3) on the basis of the attorney-client privilege or the work product doctrine (or, occasionally, a combination thereof). Infineon argues that Rambus has waived its claims of privilege as to the documents in those categories because the descriptions of them on the privilege log are inadequate and not in compliance with the November 5 Order.

The application of the attorney-client and work product privileges serves valid and important purposes in our legal system, but those privileges remove otherwise pertinent information from the factfinder, thereby impeding the full and free discovery of the truth. *In re Grand Jury Subpoena*, 341 F.3d 331, 335 (4th Cir.2003). Thus, the United States Court of Appeals for the Fourth Circuit teaches that district courts should construe these privileges quite narrowly, recognizing them "only to the very limited extent that ... excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir.1998) (internal quotations and citation

omitted).[8] Moreover, as the party seeking to assert a privilege, Rambus bears the burden of establishing that a privilege applies to document as to which the claim of privilege is made. *In re Grand Jury Subpoena,* 341 F.3d at 335; *In re Grand Jury Proceedings,* 102 F.3d 748, 750 (4th Cir.1996). To meet its burden on the attorney-client privilege claim, Rambus must show, as to each document, that:

> (1) the asserted holder of the privilege is or has sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Hawkins,* 148 F.3d at 383. To establish the applicability of the work product privilege, Rambus must show, as to each document, that the work product in question was: (1) prepared by, or under the direction of, an attorney and (2) was prepared in anticipation of litigation. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *In re Grand Jury Proceedings,* 102 F.3d at 750.

■ The gravamen of Infineon's motion to compel production of the documents in Categories (1) through (3) is that the entries as to those documents on Rambus' privilege log are too sparse and inadequate to satisfy the burden that Rambus has to draft a log that is detailed enough to allow an intelligent response. Infineon asks, therefore, that this Court deem Rambus' asserted privileges waived and order the documents produced.

For many years, courts have required that parties claiming privileges demonstrate entitlement thereto in a list or log that describes the ground of the putative protection with a degree of specificity that allows the opposing party to assess the assertion of the privilege against the applicable tests and to challenge any claim thought to be wanting. That assessment and any challenge, of course, must be done on the basis of the description contained on the log (or an equivalent pleading) because the opposing party does not have access to the putatively privileged document when seeking to mount a challenge to a privilege claim. Accordingly, the descriptions in the log must satisfy the claiming party's burden.

To achieve these purposes, the Scheduling Order entered in this case on October 3, 2000 provided:

> If a party objects to the production of documents on the grounds of attorney-client privilege, attorney work product doctrine, or any other privilege, the objecting party must provide the requesting party with *an inventory list* of the documents to which objection is made, *together with a brief description* of the document, including the date, the author, and the identity of each recipient, and the claimed basis for its protection, *all of which shall be sufficient to permit the opposing party to assess the claim of privilege or protection.*

Order, Oct. 3, 2000, at 3 (emphasis added). That order reflects the applicable Federal Rule of Civil Procedure which states:

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly

---

8. The underlying lawsuit concerns an action arising under the federal patent laws. Thus, at least as respects any issues of patent law, the decisional law of the United States Court of Appeals for the Federal Circuit, rather than that of the Fourth Circuit, is controlling. *See Silicon Image, Inc. v. Genesis Microchip, Inc.,* 271 F.Supp.2d 840, 849 (E.D.Va.2003). Nevertheless, in reviewing procedural matters that are unrelated to patent issues, the Federal Circuit adjudicates in accordance with the applicable regional circuit law. *Wang Labs., Inc. v. Applied Computer Sci., Inc.,* 958 F.2d 355, 357 (Fed.Cir.1992). Therefore, because discovery and the application of the various privileges are procedural matters not peculiar to patent law, Fourth Circuit precedent— as refined by the decisions of the United States Supreme Court—is controlling. *Id.; Silicon Image, Inc.,* 271 F.Supp.2d at 849.

and *shall describe* the nature of the documents, communications, or things not produced or disclosed *in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.*

Fed.R.Civ.P. 26(b)(5) (emphasis added).

At the status conference on October 31, 2003, the Court was reminded about disputes that had arisen in the original pre-trial proceedings respecting the adequacy of the privilege logs. Mindful of those disputes and the problems that they had caused and aware of how Rambus had misused the attorney-client and work product privileges in those pre-trial proceedings, the Court reviewed the terms of the rules with the parties and admonished that privilege logs must be "very fulsome." Transcript of Hearing, October 31, 2003, at 56. And, in the November 5 Order, the parties were required to serve privilege logs and to support them with memoranda of law which "shall state the basis for the claim of privilege with sufficient specificity to permit the filing of a meaningful motion to compel production of such documents." November 5 Order, at ¶ 4.

Notwithstanding the Court's repeated admonitions and the terms of the relevant rules and orders, the privilege list filed by Rambus on December 15, 2003 is so sparse, in significant part, on its face, as to be inadequately compliant with the rules and orders. Many of the entries on Rambus' log simply lack the information necessary to determine whether a privilege applies. For instance, respecting the work product doctrine, many entries on Rambus' privilege log do not state whether an attorney was involved in the creation of the document or whether the document was created in anticipation of litigation. Moreover, as to those entries asserting the attorney client privilege, many do not even state whether the communication involved legal advice. *United States v. Bollin,* 264 F.3d 391, 412 (4th Cir.2001) ("[T]he attorney client privilege protects only confidential communications made for the purpose of seeking *legal advice.*") (emphasis added).

Furthermore, the three page supporting memorandum filed by Rambus was a general boilerplate recitation of the attorney-client privilege and the work-product doctrine. *See* Def. Ex. 11. Hence, the memorandum in no way remedied the inadequacy of the privilege log.

Rambus responds to Infineon's complaints about the adequacy of the privilege showing by making the rather remarkable argument that Infineon has not carried the burden of showing that the documents are not privileged. That argument, of course, turns the applicable law on its head. The burden is on Rambus to show the validity of its claims of privilege. *In re Grand Jury Proceedings,* 102 F.3d at 750.

The issue of burdens aside, Rambus further contends that its privilege log is adequate. In support of this argument, Rambus relies principally on *Jackson v. County of Sacramento,* 175 F.R.D. 653 (E.D.Ca.1997), wherein the court stated:

A lawyer's statement that information is being withheld under a claim of attorney-client privilege is an implicit assertion that the information was conveyed in confidence by a client to an attorney for the purposes of facilitating legal services.... The assertion of attorney work product protection carries its own implicit assertion about the factual predicate for the claim.

*Jackson,* 175 F.R.D. at 656. That may be true as far as it goes, but it does not help Rambus because, in *Jackson,* the court went on to cite Fed.R.Civ.P. 26(b)(5) for the proposition that any claim of privilege must be accompanied by a description adequate enough for the opposing party to ascertain whether the material truly is protected.

It is true that the courts necessarily must operate on the assumption that attorneys will not take legal positions unsupported by the facts. Thus, the *Jackson* court was correct to note that a claim of privilege carries with it an implicit assertion that the claim is factually warranted. That, however, does not absolve a party from its duty under Rule 26 to provide an adequate privilege log, and *Jackson* did not so hold. This is especially so where, as here, Rambus has engaged in dilatory discovery practices in the past, *see Rambus, Inc.,* 155 F.Supp.2d at 681, and the

Court instructed the parties that any privilege log must be particularly specific, fulsome, and fleshed out. At bottom, Rambus' privilege log, on its face, simply does not comport with Fed.R.Civ.P. 26(b)(5), the Scheduling Order, or the November 5 Order.

After reviewing the privilege log, the motion to compel, and the briefs respecting the adequacy of Rambus' privilege log, the Court, by an order entered on January 28, 2004, called for an *in camera* inspection of the privileged documents in order to ascertain the extent to which the documents matched, or were reasonably described by, the privilege log. The subsequent *in camera* review confirmed what appeared on the face of Rambus' privilege log: the privilege log is inadequate. The *in camera* review also disclosed that, if the log had been adequate, many documents either would have not been claimed as privileged or an adequate description would have permitted the filing of a motion to compel.

The finding of inadequacy, particularly in light of Rambus' earlier discovery and litigation misconduct, conceptually is sufficient to warrant a finding that the privileges have been waived. That result, however, is inappropriate here because Infineon has not complied with Local Rule 37(E) which provides that: "No motion concerning discovery matters may be filed until counsel shall have conferred in person or by telephone to explore with opposing counsel the possibility of resolving the discovery matters in controversy." A like provision is incorporated in Pretrial Schedule A which is part of the Scheduling Order entered in this action on October 3, 2000. *See* Docket No. 9. It is undisputed, however, that Infineon did not seek to meet and confer with counsel for Rambus respecting the perceived inadequacy of the privilege log before Infineon filed its motion to compel.

In its defense, Infineon argues that the November 5 Order, which set the briefing schedule for discovery on remand, did not specify that a party wishing to file a motion to compel must first meet and confer, but did require the parties to meet and confer about other issues. Thus, says Infineon, the November 5 Order disposed of the meet and confer requirements of Local Rule 37(E).

The absence of a specific meet and confer provision in the November 5 Order, however, does not eliminate the requirements of Local Rule 37(E) or Pretrial Schedule A. Thus, as to the adequacy of Rambus' privilege log, the meet and confer provisions were still in effect. And, because Infineon did not abide by Local Rule 37(E), the Court declines to impose the exceedingly harsh sanction of deeming Rambus' asserted privileges waived. *See* 6 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 26.90 at 236–37 (3d ed.2003). Rambus, however, as directed at the end of the hearing held by telephone conference on February 2, 2004, was required to submit a new privilege log that satisfies the applicable rules and orders.

### B. The Alleged Waiver of the Privileges by Production of the Documents in the *Hynix* Litigation and the FTC Proceeding

The next subset (Category (4)) of Infineon's motion to compel documents listed on Rambus' privilege log concerns the issue of waiver.[9] As explained above, Rambus is currently engaged in parallel litigations involving the patents-in-suit that are at issue here, Rambus' conduct at JEDEC, and Rambus' alleged monopolization of the DRAM-related technologies and the DRAM market. In those cases, Rambus has produced to its adversaries documents falling within the scope of the March 7 Order that Rambus did not turn over to Infineon in this case. In other words, the production process in the other cases disclosed that Rambus' compliance with the March 7 Order was not complete.

At the first status conference following remand, the parties disagreed whether Infineon's document requests here called for documents of the type that Rambus produced to Hynix and the FTC. Desirous of confining discovery on remand, to the extent possible,

---

9. On this topic (Category (4)), as well as the next one (Category (5)), the parties had already conferred before the November 5 Order and were at an impasse. No further conference, therefore, was necessary.

to the issues framed by the original proceedings and the Federal Circuit's remand order, the Court, in the November 5 Order, required a review of previous document requests herein (as modified by applicable previous discovery rulings) and a review of the documents produced to Hynix and the FTC. Then, the November 5 Order required production of so much of the documents produced in the *Hynix* and FTC cases as had been previously requested by, but not produced to, Infineon in the proceedings before the first trial in this case.

As a result of that process, Rambus produced some thirty boxes of documents that Infineon had requested but that Rambus had not previously produced. Moreover, through discussions with the lawyers representing Hynix, Micron, and the FTC, as well as an examination of the records created in those cases, Infineon realized that Rambus had produced to Hynix, Micron, and the FTC a number of documents responsive to the March 7 Order that Rambus had not produced to Infineon. These are the documents that are the subject of Category (4) of Infineon's first motion to compel.

Before assessing whether Rambus has waived any privilege that attaches to these documents by producing them to Hynix, Micron, and the FTC, it is necessary to note a more basic point. Specifically, these documents were requested by Infineon, were subject to the March 7 Order, and were part of a larger body of documents that should have been, but were not, produced to Infineon before the trial of this case. In other words, the failure to produce these documents before now was an abuse of the discovery process (failure to produce requested documents) and was disobedience of the March 7 Order, both of which support an order requiring their production now.

The excuse offered by Rambus for not producing these documents when they should have been produced is that the requests for production by the FTC, Micron, and Hynix "required Rambus to search files that it had not thought likely to contain documents responsive to Infineon's requests." Pls. Mem. in Opp., at 7. That vague, conclusory statement does not explain why the files were not thought to contain responsive documents or why they were not searched after the March 7 Order was issued. Nor does Rambus offer any explanation about what process it did follow to comply with Infineon's requests and the March 7 Order. Rambus does not even explain who maintained these belatedly discovered files or how they were overlooked. Without information such as that, it is impossible to give credence to the naked assertion offered by Rambus to support its assertion of "inadvertence." That is especially so given the volume of inadvertently overlooked documents.

■ The utter failure to explain the failure to produce these documents in a timely fashion is sufficient to require their immediate production without even considering the issue respecting waiver of privilege. Nonetheless, that issue is ripe and the Court will consider it.

■ Once a party voluntarily discloses otherwise privileged documents to a third party, the disclosing party waives any privilege respecting the documents that were voluntarily disclosed. *Sheet Metal Workers Int'l Ass'n v. Sweeney,* 29 F.3d 120, 125 (4th Cir.1994); *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) (per curiam). Rambus does not dispute the fact that it disclosed many documents to its adversaries in the *Hynix, Micron,* and FTC litigations. Rather, it contends that it did not make these disclosures voluntarily.

■ In the litigation with Micron, the United States District Court for the District of Delaware ordered Rambus to disclose documents falling within the crime/fraud exception. That order was based on the findings in the March 7 Order. It is clear that a "judicially compelled" disclosure is not a voluntary one. *Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington,* 103 F.R.D. 52, 63 n. 2 (D.D.C.1984). Thus, because it produced the documents to Micron only after a judge ordered it to do so, Rambus did not waive any privilege by disclosing the documents to Micron.

■ The facts respecting disclosure to Hynix and the FTC, however, are quite differ-

ent. On June 4, 2001, Hynix filed a motion in this Court seeking leave to intervene in this action to obtain access to the crime/fraud documents that Rambus had produced here pursuant to the March 7 Order. Shortly thereafter, Rambus produced documents to Hynix and, pursuant to an agreement formalized in a June 22, 2001 letter, Hynix thereafter withdrew its motion to intervene.[10] Infineon, therefore, argues that Rambus made the "tactical decision" to disclose the documents in order to preclude Hynix's intervention in this case and, therefore, that the documents were disclosed voluntarily to Hynix.

In the FTC administrative action, the FTC moved to compel Rambus to disclose certain documents. In opposing this motion, Rambus volunteered to disclose to the FTC those documents that fell within the March 7 Order. Rambus objected, however, to any attempt by the FTC to expand the scope of the March 7 Order. Thereafter, Rambus produced to the FTC documents responsive to the March 7 Order, including documents not produced to Infineon. Infineon argues, therefore, that Rambus also voluntarily disclosed the documents to the FTC.

Rambus, however, argues that its disclosure of the documents in both the *Hynix* and FTC litigations was "virtually compelled" in light of the March 7 Order. Rambus states that, after contesting without success the crime/fraud determination,[11] its only choice was to produce the documents to the FTC and Hynix and then later appeal the crime/fraud ruling. Indeed, without citing any authority, Rambus argues that the doctrine of collateral estoppel preordained the outcome of any challenge it may have mounted to the production of the crime/fraud documents in the parallel litigations. Thus, says Rambus, the disclosures were judicially compelled and do not result in a waiver of the privileges.

To support its position, Rambus relies on the decision of the United States Court of Appeals for the Fifth Circuit in *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir.1988). In *Ward*, the district court had compelled the disclosure of certain documents containing attorney-client communications; the plaintiff then used these documents in an attempt to establish the defendants' scienter in an alleged securities fraud violation. In an attempt to rebut these allegations, the defendants then introduced further privileged documents in order to mount an advice-of-counsel defense.

On appeal, the Fifth Circuit reversed the district court's initial decision to compel disclosure of the attorney-client communications and also held that the defendants' later choice to introduce privileged documents did not constitute a waiver of the privilege as to those documents because the disclosure was effectively compelled by the initial adverse ruling. *Ward*, 854 F.2d at 789. The court, therefore, held that the defendants still maintained their privilege as to the second set of disclosed documents, despite the fact that the defendants disclosed them "voluntarily." *Id.*

Rambus cites *Ward* for the proposition that its seemingly voluntary disclosures in the *Hynix* and FTC actions were in fact virtually compelled. The reliance on *Ward* might be correct if Rambus had challenged the March 7 Order on appeal and the Federal Circuit had reversed it. Rambus, however, did not appeal that order. This case, therefore, is very much unlike *Ward* because Rambus has not obtained an appellate determination that the initial compelled disclosure of documents was erroneous. At bottom, the March 7 Order still stands.[12] Hence, *Ward* does not apply here.

10. In this written agreement, Hynix agreed that Rambus' production of the documents did not constitute a waiver of Rambus' right to appeal the March 7 Order. *See* Def. Ex. 14. Rambus, however, did not address the March 7 Order in its appeal of the judgment in this action to the Federal Circuit.

11. As previously recounted, Rambus filed a petition for a writ of mandamus in the Federal

Circuit, asking the appellate court to overrule the March 7 Order. The Federal Circuit, however, denied this petition.

12. In addition, as discussed more fully below in subsection C, nothing in the Federal Circuit's opinion undermines the continuing validity of the March 7, 2001 crime/fraud Order.

Wholly apart from the inapplicability of *Ward,* Rambus' argument is vitiated by the fact that the FTC twice held that Rambus' production in the *Hynix* litigation was voluntary.[13] Furthermore, as late as May 2003, Rambus actually conceded that its privilege over those documents had been irrevocably lost. Def. Ex. 33. And, whether or not the FTC's lawyers chose to press the point, there is no doubt that Rambus voluntarily produced to the FTC the documents that Infineon seeks.[14]

As the party asserting the privilege, Rambus has the burden to prove that the privilege applies. That burden includes establishing that the privilege was not waived. *Hawkins v. Stables,* 148 F.3d 379, 383 (4th Cir.1998); *see also Sheet Metal Workers Int'l Ass'n v. Sweeney,* 29 F.3d 120, 125 (4th Cir. 1994); *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) (per curiam). Because Rambus has already disclosed the at-issue documents in two parallel proceedings it has a high hurdle to overcome to establish that it did not waive its privilege as to these documents.[15] Rambus has failed to do so in this case.

Indeed, Infineon has shown that Rambus made a trade-off with Hynix, securing from Hynix the abandonment of its effort to intervene in exchange for the documents. Disclosure to achieve a tactical objective, of course, effectuates a waiver. *Jones,* 696 F.2d at 1072 (citing *In re Sealed Case,* 676 F.2d 793, 808–09 (D.C.Cir.1982)). Where, as here, there is shown an apparent tactical advantage to the disclosing party, the disclosing party cannot meet its burden to show the absence of waiver merely by making a conclusory assertion, as Rambus does, that there was really no, or very little, advantage

gained. For reasons then sufficient unto themselves, Rambus struck a deal with Hynix. For its part, Rambus voluntarily disclosed the documents here at issue. That is not judicially compelled disclosure.

Finally, it would be inconsistent with the policy that calls for narrow application of privileges that are obstructive of the search for truth to permit privileged documents to be used in two related proceedings but not in this one. That is especially true where, as here, those documents should have been disclosed to Infineon in the first place and were made available in one of the related proceedings pursuant to an agreement that the disclosing party thought at the time was in its interest to make.

Thus, this portion of Infineon's motion to compel will be granted and Rambus will be ordered to turn over those documents that it has already provided to its adversaries in the litigations with Hynix and the FTC.

### C. The Twenty–Seven Documents That Rambus Admits Fall Under the March 7 Order That Have Not Been Produced Anywhere

In its privilege log and accompanying memorandum, Rambus notes that it has intentionally withheld approximately twenty-seven documents that fall under the March 7 Order, but that have not been elsewhere produced. Rambus did not produce these twenty-seven documents before the first trial in this case because, as Rambus asserts, again in a conclusory fashion, they were located "in files" that Rambus "had not thought likely to contain documents responsive to Infineon's request." Pls. Mem. in Opp., at 7. And, for reasons neither ex-

---

13. Contrary to Rambus' argument, the administrative law judge ("ALJ") in the FTC proceedings did not reverse its earlier decision that production of documents in the *Hynix* litigation was voluntary. *See* Def. Ex. 19. Rather, the ALJ held that voluntary production of those documents did not constitute a subject matter waiver that opened up *other* documents to discovery. *Id.*

14. Rambus argues that collateral estoppel would have applied to render futile an objection to producing the documents in the *Hynix* litigation or in the administrative proceedings before the

FTC. Rambus, however, has cited no authority to support that argument and the naked argument is insufficient to satisfy the burden that Rambus must show in order to prevail on its theory that the productions to Hynix and the FTC were judicially compelled.

15. As noted above, application of the attorney-client and work product privileges remove otherwise pertinent information from the fact-finder, thereby impeding the full and free discovery of the truth. *In re Grand Jury Subpoena,* 341 F.3d 331, 335 (4th Cir.2003).

pressed nor readily apparent, Rambus has not produced these documents to Hynix or the FTC even though Rambus supposedly found the documents in searches stemming from those cases.

Rambus has made no showing respecting where those documents were located. Nor has Rambus made any effort to explain why, in the original proceeding, it was reasonable for Rambus to have believed that the files in which these twenty-seven documents were located would not "contain documents responsive to Infineon's request." Pls. Mem. in Opp., at 7. Considering Rambus' previous litigation misconduct, its skimpy original response to the March 7 Order, and the fact that somehow Rambus overlooked thirty boxes of documents requested by, but not produced to, Infineon,[16] this conclusory explanation for why these documents were not previously produced is simply inadequate and unacceptable. Moreover, having reviewed the twenty-seven documents *in camera*[17] and being familiar with other documents produced after the March 7 Order, it is difficult to discern how they would have been located at some place (wherever that might have been) *in files* that reasonably would have been thought not to contain responsive documents.[18] Hence, on this record, the Court cannot credit Rambus' claim that it failed to disclose these documents through simple inadvertence. That alone is reason enough to require their production now.

Moreover, rather than producing these twenty-seven documents with a detailed explanation of why they were not produced originally, Rambus is withholding them in an effort to have revisited the holdings on which the March 7 Order was based even though Rambus did not present those issues for review in its appeal to the Federal Circuit.

The tactic employed in pursuit of that end is Rambus' argument that the Federal Circuit's opinion on the actual fraud claim removed the "factual underpinnings" of the March 7 Order. Pls. Mem. in Opp., at 17. That, says Rambus, excuses it from producing these documents.

Rambus' argument necessitates an examination of the Federal Circuit's opinion. The portion of the Federal Circuit's opinion pertinent to this discussion is in section IV, which is entitled "Fraud." *Rambus, Inc.*, 318 F.3d at 1096. The opening paragraphs of that discussion make it quite clear that the Federal Circuit's opinion is addressing a claim of Virginia common law actual fraud. The first substantive element of the fraud claim discussed by the court appears in a subsection entitled "Duty to Disclose." *Id.* In pertinent part, the Federal Circuit held that certain language contained in materials shown at JEDEC meetings imposed a disclosure duty on members of JEDEC. *Id.* at 1098 ("Nevertheless, because JEDEC members treated the language of Appendix E as imposing a disclosure duty, this Court likewise treats this language as imposing a disclosure duty."). As respects the duty, the Federal Circuit held "that the relevant disclosure duty hinges on whether the issues or pending claims are needed to practice the standard." *Id.* at 1100. The Federal Circuit continued: "On this record, a reasonable jury could find only that the duty to disclose a patent or application arises when a license under its claims reasonably might be required to practice the standard." *Id.* Put another way, the court held that, "Rambus's duty to disclose extended only to claims in patents or applications that reasonably might be necessary to practice the standard." *Id.*

Having thus defined the duty of disclosure, the court then turned to the question "when

16. This issue is framed by the fact that, following the October 31, 2003 status conference and the brewing dispute about the adequacy of Rambus' original document production, the November 5 Order required the parties to review the original document requests and produce documents that were originally requested but not produced.

17. This *in camera* review occurred as part of the limited review undertaken by the Court to assess the adequacy of Rambus' privilege log.

18. These documents appear to belong to or be generated by or sent to Rambus' executives and its in-house and outside counsel. Why files holding such documents would not have been searched in response to the March 7 Order is difficult to understand.

the duty to disclose arises." 318 F.3d at 1101. On that score, the Federal Circuit held that "[t]he most a reasonable jury could conclude is that the disclosure duty is triggered when [a JEDEC committee] formally begins [work] on a proposed standard." *Id.* at 1102.

The Federal Circuit next examined whether there was a breach of the duty to disclose as the court had previously defined the duty. On that point, the appellate court concluded "[i]n sum, substantial evidence does not support the jury's verdict that Rambus breached its duties under the EIA/JEDEC policy. Infineon did not show the first element of a Virginia fraud action and therefore did not prove fraud associated with the SDRAM standard. No reasonable jury could find otherwise." *Rambus, Inc.,* 318 F.3d at 1105.[19]

Considering the explicit text of the Federal Circuit's opinion, the Court concludes that the Federal Circuit meant what it said in clear terms: Infineon did not show the first element of a Virginia fraud action, *i.e.,* "omission in the face of a duty to disclose." *Rambus, Inc.,* 318 F.3d at 1096. That result obtained because, under Virginia law, mere silence or the withholding of information does not constitute fraud in the absence of a duty to disclose. *Id.* (citing *Bank of Montreal v. Signet Bank,* 193 F.3d 818, 826 (4th Cir.1999); *ITT Hartford Group, Inc. v. Va. Fin. Assoc.,* 258 Va. 193, 203, 520 S.E.2d 355, 361 (1999)). Simply put, the Federal Circuit found a duty to disclose, defined it, and then articulated when that duty arose. Then, in unmistakably clear terms, the court concluded that Infineon did not prove fraud.

In reaching its decision, however, the Federal Circuit did not conclude Rambus had not engaged in a fraudulent scheme. Indeed, the Federal Circuit noted that "Rambus wanted to obtain claims covering the SDRAM standard .... Rambus thought it could cover the

SDRAM standard and tried to do so while a member of an open standards-setting committee." 318 F.3d at 1104. The court opined that the evidence "does not put Rambus in the best light," and that Rambus' actions "impeach [its] business ethics." *Id.*

▉▉▉▉ The Federal Circuit's decision certainly holds that Infineon failed to prove that Rambus had succeeded in achieving the objective of the scheme. Actual success as to the fraudulent or criminal scheme, however, is immaterial to the application of the crime/fraud exception, *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1039 (2d Cir. 1984), because it is the planning and pursuit of the scheme with the advice of counsel, not the scheme's success or failure, that animates the crime/fraud exception.[20]

Nothing in the Federal Circuit's opinion negates the overwhelming evidence that Rambus planned a fraudulent scheme to obtain claims covering the SDRAM standard and to conceal these claim from JEDEC. As recounted above, the Federal Circuit found that "Rambus wanted to obtain claims covering the SDRAM standard ... thought it could cover the SDRAM standard and tried to do so while a member of an open standards-setting committee." *Rambus, Inc.,* 318 F.3d at 1104. Nor did the Federal Circuit disturb the findings set forth in the March 7 Order that Rambus sought the advice of counsel in furtherance of its scheme. Thus, contrary to Rambus' contentions, the Federal Circuit's opinion did not remove the factual underpinnings of the March 7 Order.

For the foregoing reasons, Rambus will be required to produce immediately the twenty-seven documents noted in the memorandum accompanying its updated privilege log that fall within the March 7 Order.

---

19. The Federal Circuit then went on to discuss, and affirm, the decision of this Court granting Rambus' motion for JMOL respecting the DDR–SDRAM's standard-setting process because "Infineon did not show that Rambus had a duty to disclose before the DDR–SDRAM's standard-setting process formally began." 318 F.3d at 1105.

20. The crime/fraud exception to the attorney-client privilege and work product doctrine applies when the client was engaged in or planning a fraudulent or criminal scheme when it sought the advice of counsel and the documents involved bear a close relationship to the fraudulent or criminal scheme. *Chaudhry v. Gallerizzo,* 174 F.3d 394, 403 (4th Cir.1999); *In re Grand Jury Proceedings,* 33 F.3d 342, 352 (4th Cir.1994).

## II. Infineon's Motion to Compel Production of Documents and Testimony Relating to Rambus' Document Retention, Collection, and Production

In its second motion, Infineon moves to compel the production of documents and testimony that relate to Rambus' document retention, collection, and production of documents. In this motion, Infineon seeks an order compelling Rambus to produce:

(1) Six documents on Rambus' privilege log [21] and all other documents that relate to document retention;

(2) Other documents relating to Rambus' document retention policy or its document destruction including transcripts from depositions or trials, as well as pleadings that relate to the topic of Rambus' document retention policy and document destruction;

(3) Documents relating to the collection and production of documents in this case and any other case involving SDRAM.

The motion also asks for a date certain on which to depose Rambus' witnesses and attorneys on the topic of Rambus' document retention, collection, and destruction.

The background respecting this motion has its genesis in the original pretrial proceedings when the discovery process disclosed some troublesome conduct on the part of Rambus. After the trial, Rambus was found to have committed various acts of litigation misconduct, including the intentional destruction of documents relevant to this action. *Rambus, Inc.,* 155 F.Supp.2d at 682. After the trial of this action in April and May 2001, Rambus continued to be involved in other litigation involving SDRAM technology and patents, including the patents-in-suit here. As noted in the discussion of Infineon's other motion to compel, in those other parallel cases, Rambus produced some thirty boxes of documents that were requested here by, but never produced to, Infineon. Rambus has now, albeit belatedly, supplied those thirty boxes of documents to Infineon.

Thereafter, as a result of the contents of the late-produced documents, the text of the supplemental privilege log discussed previously, and information obtained in the parallel litigations, Infineon discovered that the document destruction in which Rambus had engaged was much more extensive than was unearthed just before the original trial of this case. Infineon, citing the FTC proceedings, asserts that, on one day alone, September 3, 1998, a/k/a "Shred Day," Rambus destroyed over 20,000 pounds of documents (or approximately 2 million pages). And, there is evidence that the destruction continued well after that event.

Against this background, Infineon seeks discovery into Rambus' document retention, destruction, collection, and production. It offers two grounds in support of this motion, one based on spoliation and the other based on the subject-matter waiver rule.

### A. Spoliation and the Piercing of Rambus' Privileges

Infineon contends that ample evidence exists to support a finding that Rambus implemented a document destruction program in order to destroy documents that might have proved unfavorable in litigation and that Rambus did so at a time when it anticipated patent litigation with DRAM manufacturers, including Infineon. In other words, Infineon contends that Rambus spoliated evidence. Infineon, therefore, contends that the crime/fraud exception to the attorney client and work product privileges applies and that the Court should pierce Rambus' asserted privileges with respect to any documents related to this document destruction policy.

The crime/fraud exception to the attorney-client and work product privileges provides that otherwise privileged communications or work product made for, or in furtherance of, the purpose of committing a crime or fraud will not be privileged or protected. *Chaudhry v. Gallerizzo,* 174 F.3d 394, 403 (4th Cir.1999); *In re Grand Jury Proceedings,* 33 F.3d 342, 348 (4th Cir.1994); *see generally Developments in the Law—Privileged Communications,* 98 Harv. L.Rev. 1450, 1509–14 (1985). As noted by the United States Court of Appeals for the Second Circuit:

---

**21.** Entries No. 313, 326, 327, 1114, 2784, and 4077.

Whereas confidentiality of communications and work product facilitates the rendering of sound legal advice, advice in furtherance of a fraudulent or *unlawful goal* cannot be considered 'sound.' Rather advice in furtherance of such goals is socially perverse, and the client's communications seeking such advice are not worthy of protection.

*In re Grand Jury Subpoena,* 731 F.2d 1032, 1038 (2nd Cir.1984) (emphasis added). Thus, although referred to as an "exception" to the attorney-client and work product privileges, the crime/fraud exception is not truly an exception.[22] Rather, it is an exclusion of certain activity from the reach of the privileges. *In re Grand Jury Subpoena,* 731 F.2d at 1038. As one noted commentator has put it, the crime/fraud "exception" merely delineates the outer contours of the attorney-client and work product privileges, recognizing the commonsense notion that these privileges "cannot avail to protect the client in concerting with the attorney a crime or other evil enterprise." 8 John Wigmore, *Evidence* § 2298 at 572 (McNaughton rev. 1961); *see also In re St. Johnsbury Trucking Co. v. Bankers Trust Co.,* 184 B.R. 446, 456 (Bankr.D.Vt.1995) ("[T]he exception is not really an exception, but an exclusion.").[23]

▮▮▮▮ Infineon argues that, because the sought-after documents pertain to spoliation, the crime/fraud exception applies. Spoliation is "the willful destruction of evidence or the failure to preserve potential evidence for another's use in pending or future litigation." *Trigon Ins. Co. v. United States,* 204 F.R.D. 277, 284 (E.D.Va.2001); *see also Anderson v. Nat'l R.R. Passenger Corp.,* 866 F.Supp. 937, 945 (E.D.Va.1994). In order to establish spoliation, the movant must show (1) that the adverse party had a duty to preserve evidence and (2) that it nevertheless intentionally destroyed the evidence. *Trigon Ins. Co.,* 204 F.R.D. at 284. The duty to preserve evidence "arises not only during litigation but also extends to the period before the litiga-

tion when a party reasonably should know that the evidence may be relevant to *anticipated litigation."* *Silvestri v. Gen. Motors Corp.,* 271 F.3d 583, 591 (4th Cir.2001) (emphasis added). Therefore, once a party reasonably anticipates litigation, it has a duty to suspend any routine document purging system that might be in effect and to put in place a litigation hold to ensure the preservation of relevant documents—failure to do so constitutes spoliation. *Id.; see also Lewy v. Remington Arms Co., Inc.,* 836 F.2d 1104, 1112 (8th Cir.1988); *Thompson v. United States Dep't of Hous. & Urban Dev.,* 219 F.R.D. 93, 101 (D.Md.2003). And, certainly, there is a duty not to initiate a document destruction regime if the party reasonably anticipates litigation.

Thus defined, however, spoliation is not a crime nor is it a fraud. Although the Fourth Circuit occasionally refers to the crime/fraud exception as the crime/fraud/*tort* exception, *e.g., Chaudhry,* 174 F.3d at 403; *In re Grand Jury Subpoenas,* 902 F.2d 244, 245 (4th Cir. 1990), spoliation, although raising issues of duty and breach, does not quite qualify as a tort either. *Cf. Silvestri,* 271 F.3d at 590 (stating that spoliation does not give rise to independent substantive claim). *But see* Terry R. Spencer, *Do Not Fold, Spindle, or Mutilate: The Trend Towards Recognition of Spoliation as a Separate Tort,* 30 Idaho L.Rev. 37 (1993). At first blush, therefore, it would not appear that documents created to provide a plan for spoliation would fall under the crime/fraud exception.

▮▮▮▮ The term "crime/fraud exception," however, is "a bit of a misnomer," *Blanchard v. EdgeMark Fin. Corp.,* 192 F.R.D. 233, 241 (N.D.Ill.2000), as many courts have applied the exception to situations falling well outside of the definitions of crime or fraud. *E.g., Parrott v. Wilson,* 707 F.2d 1262, 1271 (11th Cir.1983) (stating that crime/fraud exception applies to work product created as result of lawyer's "unprofessional conduct"); *Cleve-*

---

**22.** Indeed, in order to establish the applicability of the attorney-client privilege, the proponent must show, *inter alia,* that the communication was not made "for the purpose of committing a crime or tort." *Hawkins,* 148 F.3d at 383.

**23.** These observations are correct: the crime/fraud exception is not really an exception to the attorney-client or work product privileges, but instead is an exclusion of certain activity from the protection of the privileges. However, because most authorities use the term "crime/fraud *exception,*" it will be used here too.

*land Hair Clinic, Inc. v. Puig,* 968 F.Supp. 1227, 1241 (N.D.Ill.1996) (holding crime/fraud exception applicable to communications made in furtherance of "bad faith litigation conduct"). Although the Fourth Circuit has not set forth a precise test for application of the crime/fraud exception, it is inconceivable that our Court of Appeals would find that a corporate client's interest in confidential communications respecting destruction of documents in anticipation of litigation would outweigh the societal need to assure the integrity of the process by which litigation is conducted which, of course, is the purpose of prohibiting spoliation of evidence.[24]

Moreover, other courts confronted with a variety of untoward conduct have concluded that the exception is not confined to circumstances of crime or fraud. For instance, the United States Court of Appeals for the District of Columbia Circuit teaches that the crime/fraud exception applies when the work or communication was made for or in furtherance of a crime, fraud, *"or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system." In re Sealed Case,* 676 F.2d 793, 812 (D.C.Cir.1982) (emphasis added). Indeed, thus defined, that court has applied the crime/fraud exception to communications and work product created in furtherance of spoliation. *In re Sealed Case,* 754 F.2d 395, 400 (D.C.Cir.1985).[25] Furthermore, after examining the decisional law of the United States Court of Appeals for the Second Circuit, a bankruptcy court in Vermont held that the crime/fraud exception should apply to communications or work product created "in furtherance of some *sufficiently malignant purpose," In re St. Johnsbury Trucking Co. v. Bankers Trust Co.,* 184 B.R. 446, 456 (Bankr.D.Vt.1995) (emphasis added), a

definition that would include cases of spoliation. Similarly, after examining the decisional law of the United States Court of Appeals for the Fifth Circuit, a district court in Florida held—in the context of the attorney-client privilege—that the crime/fraud exception applies "not only where fraud or crime is involved, but also where there are other *substantial abuses of the attorney-client relationship." International Tel. & Tel. Corp. v. United Tel. Co. of Fla.,* 60 F.R.D. 177, 180 (M.D.Fla.1973) (emphasis added); *see also Sound Video Unlimited, Inc. v. Video Shack, Inc.,* 661 F.Supp. 1482, 1486 (N.D.Ill.1987) ("The attorney-client privilege does not apply when the person consults an attorney to further a continuing or future crime, fraud *or other misconduct.*") (emphasis added).

More importantly, construing the crime/fraud exception to capture spoliation is fully consonant with the Fourth Circuit's instructions on how to apply the underlying privileges.[26] In the Fourth Circuit, the attorney-client and work product privileges are to be "strictly confined within the narrowest possible limits consistent with the logic of [their] principle[s]." *In re Grand Jury Proceedings,* 727 F.2d 1352, 1355 (4th Cir.1984) (internal citations and quotations omitted). Courts recognize the attorney-client privilege because "full and frank" discussions between lawyer and client "encourages observance of the law and aids in the administration of justice." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *see also Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The work product doctrine recognizes that lawyers, as officers of the court bound both

---

**24.** District courts within the Fourth Circuit have applied the exclusion in varying circumstances. *See, e.g., United States v. Ruhbayan,* 201 F.Supp.2d 682, 686 (E.D.Va.2002) (applying crime/fraud exception upon prima facie showing of obstruction of justice); *Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Group, Inc.,* 116 F.R.D. 46, 53 (M.D.N.C.1987) (discussing crime/fraud exception in context of violations of anti-trust law); *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1172 (D.S.C.1974) (assuming applicability of crime/fraud exception to violations of antitrust law).

**25.** The spoliation at issue in *In re Sealed Case* included the "willful, systematic and extensive" destruction of documents that had been subpoenaed. 754 F.2d at 400.

**26.** As stated in footnote 23 *supra,* in defining the crime/fraud exception, the Court is actually delineating the substantive scope of the attorney-client and work product privileges. *See also In re St. Johnsbury Trucking Co.,* 184 B.R. at 456.

to "work for the advancement of justice" and the "rightful interests" of their clients, must be able to produce material without fearing its wide dissemination. *Hickman v. Taylor*, 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In order to represent zealously clients in our adversarial system of justice, lawyers must be free to assemble information, sift the relevant from the irrelevant facts, prepare legal theories, and plan strategy without the undue interference of having their thoughts and opinions broadcast widely. *Hickman*, 329 U.S. at 511, 67 S.Ct. 385. The work product doctrine, therefore, recognizes that the widespread distribution of attorneys' work product would have a "demoralizing" effect on the profession that would not benefit individual clients or the system as a whole. *Id.*

It is self-evident, however, that any communication between lawyer and client respecting spoliation is fundamentally inconsistent with the asserted principles behind the recognition of the attorney-client privilege, namely, "observance of law" or the "administration of justice." *Weintraub*, 471 U.S. at 348, 105 S.Ct. 1986. Indeed, by intentionally removing relevant evidence from litigation, spoliation directly undermines the administration of justice. *Cf. Craig v. A.H. Robins Co., Inc.*, 790 F.2d 1, 3–4 (1st Cir.1986) (allowing introduction of evidence that would otherwise have been protected by attorney-client privilege because communications pertained to intentional destruction of evidence, a subject contrary to administration of justice). Moreover, an attorney who counsels a client to spoliate evidence is not advancing the observance of the law, but rather counseling misconduct. Thus, there is no logical reason to extend the protection of the attorney-client privilege to communications undertaken in order to further spoliation. *Cf. Madanes v. Madanes*, 199 F.R.D. 135, 149 (S.D.N.Y.2001) ("At a minimum, then, the attorney-client privilege does not protect communications ... that undermine[] the adversary system itself.").

Similarly, attorney work product materials that relate to the spoliation of evidence neither "work for the advancement of justice" nor further the "*rightful* interests" of an attorney's client. *Hickman*, 329 U.S. at 510, 67 S.Ct. 385 (emphasis added). Declining to afford such materials protection would not have a "demoralizing" effect on the profession nor would it fail to accord attorneys, as officers of courts, their rightful sphere of protection. *Id.* at 511, 67 S.Ct. 385. Indeed, by removing the ability of lawyers and clients to hide such materials behind the work product privilege, the profession will be able to ferret out members engaged in unscrupulous behavior. Simply put, the work product privilege should not extend to work product that pertains to the intentional destruction of litigation materials.

For these reasons, the Court holds that the crime/fraud exception extends to materials or communication created for planning, or in furtherance of, spoliation. *Cf. Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590–91 (4th Cir.2001) (noting district court confronted with spoliation can impose wide range of remedies). That conclusion, however, does not resolve the issue whether the crime/fraud exception applies to the documents that Infineon seeks to compel. In order to pierce Rambus' claims of privilege in this case, Infineon must show (1) that Rambus was engaged in or planning a scheme of spoliation when it sought the advice of counsel or the input of the lawyers' work product to further the scheme and (2) that the documents containing the communications or work product bear a close relationship to Rambus' scheme to engage in spoliation. *Chaudhry*, 174 F.3d at 403.

It is beyond question that Rambus instituted a document destruction policy and thereby intentionally destroyed documents. Moreover, it is undisputed that the destroyed documents covered all of the major categories of documents generated in the ordinary course of Rambus' business. And, the Court has found that Rambus destroyed documents relevant to this case. *Rambus, Inc.*, 155 F.Supp.2d at 682. Through depositions, Infineon has established that Rambus' document purging program resulted in the destruction of evidence relevant to this action, including evidence related to: the prosecution of the patents-in-suit, Rambus' participation in JEDEC, Rambus' prosecution of

JEDEC-related patents, the relationship of Rambus' patent applications and pending claims to JEDEC standards, presentations to Rambus' Board of Directors regarding intellectual property, potentially damaging or invalidating prior art, and Rambus' SDRAM licensing negotiations. Thus, it is established that Rambus destroyed evidence and that at least some of this evidence was relevant to the this action.

Furthermore, there has been a finding in this action that some destruction occurred at a point in time when Rambus anticipated litigation and therefore had a duty to preserve the evidence. That finding was made on the basis of a somewhat more limited record respecting the scope and effect of the destruction.[27] But, the finding was not made in the context of an effort to pierce the attorney-client and work product privileges. *Rambus, Inc.*, 155 F.Supp.2d at 682. Hence, although the finding is final and is of considerable probative value, it is appropriate to consider the record as it now stands and assess the issue whether the attorney-client and work product privileges should be pierced by using the earlier finding as probative, but not dispositive, of that issue in the context of document spoliation.

On the basis of what is now known, Infineon has shown that Rambus formulated and instituted a document retention and destruction policy in early 1998. Beginning in March of that year, Joel Karp ("Karp"), a non-lawyer who serves as Rambus' Vice-President of Intellectual Property, drafted a document retention policy with the help of a law firm, Cooley Godward, LLP. In fact, entry number 313 on Rambus' updated privilege log reflects Karp's work on a document retention policy, indicating a March 19, 1998 letter sent by Cooley Godward, LLP to Karp entitled: "Memorandum regarding legal advice on Document Retention Policy Guidance." Of course, because Rambus has claimed the attorney-client privilege as to this document, Infineon cannot ascertain its precise contents. It establishes, however, at the very least, that Karp and Rambus were formulating a document purging system in early 1998.

That summer, Karp and other Rambus executives gave presentations on the document retention policy, presenting several slide shows to employees to inform them of their duties under the system. Then, Karp kicked-off the document retention program on September 3, 1998 with "Shred Day"[28] an event at which each employee at Rambus' corporate headquarters in Mountain View, California was provided with a burlap bag with the instructions to bag all documents slated for the shredder. Infineon, of course, casts Shred Day in a rather sinister fashion, pointing to internal Rambus e-mails that reflect that Shred Day culminated in a 5:00 PM beer, pizza, and champagne "celebration." Rambus, in contrast, frames this beer, pizza, and champagne treat not as a "celebration," but rather as corporate incentive and morale boosting after a day of heavy sack lifting and laborious document review. Regardless of Rambus' motivations, however, it is uncontested that, all told, Rambus employees shredded approximately 20,000 pounds of documents on Shred Day—some 2 million pages of documents. Then, on several additional days in the fall of 1998, the shredder trucks returned to Rambus, resulting in the destruction of additional documents.

In addition, Lester Vincent, Rambus' former outside patent prosecution counsel who drafted the Rambus claims, has testified that he destroyed some documents, pursuant to orders from Rambus, just before Rambus instituted this litigation in 2000 but before Rambus sent a letter to Infineon accusing it of infringement. *Rambus, Inc.*, 155 F.Supp.2d at 682. And, thereafter, Rambus instructed its other outside counsel to follow suit.

Infineon argues that Rambus instituted this document-purging program despite the fact that it anticipated litigation respecting the patents-in-suit, the DRAM-related technologies, and even the JEDEC standards

---

**27.** That finding was not challenged on Rambus' appeal on the merits and hence it is undisturbed by the Federal Circuit's opinion.

**28.** Infineon did not coin the term "Shred Day"; rather, the term appears in multiple in-house Rambus e-mails that Rambus has disclosed in discovery.

process. Therefore, says Infineon, Rambus acted in dereliction of its duty to preserve evidence. Infineon notes that Rambus' recently filed privilege log shows that, in February 1998, the same time in which Karp was developing the document retention program, Karp sent and received attorney-client communications regarding "legal strategy in anticipation of litigation" and "strategic patent litigation." Def. Ex. 10, at 25. Moreover, Infineon notes that, a mere three weeks after Shred Day, Rambus' in-house counsel, Neil Steinberg, sent Karp a memorandum entitled "preliminary infringement study." *Id.* at 27. Because Rambus has asserted that these documents are privileged, Infineon cannot ascertain precisely to which patents or litigation they pertain. Infineon, however, argues that although it cannot precisely tell what the documents discuss, the entries on the privilege log show, at the very least, that Rambus was anticipating patent litigation during the time period that it formulated and instituted its document purging system.

Infineon also points to depositions of various Rambus employees and executives. For instance, Allen Roberts, Rambus' Vice President of Engineering, testified under oath that Karp directed him to purge his files at least in part because "such materials are discoverable in subsequent litigations." Def. Ex. 26. Furthermore, Tony Diepenbrock, a lawyer in Rambus' in-house legal department, testified that one of the understood reasons behind Shred Day was that "some of that stuff is discoverable." Def. Ex. 25. Infineon posits, therefore, that Rambus intentionally destroyed documents that it feared would come back to haunt it in the anticipated DRAM-related patent litigation.

Rambus, however, contends that it adopted its document retention policy for wholly legitimate business purposes. It correctly notes that virtually all companies have document retention policies. *See generally* Christopher Cotton, *Document Retention Programs for Electronic Records: Applying a Reasonableness Standard to the Electronic Era,* 24 J. Corp. L. 417 (1999); John M. Fedders &

Lauryn H. Guttenplan, *Document Retention & Destruction: Practical, Legal, & Ethical Considerations,* 56 Notre Dame L.Rev. 5 (1980); Devin Murphy, *The Discovery of Electronic Data in Litigation: What Practitioners & Their Clients Need to Know,* 27 Wm. Mitchell L.Rev. 1825 (2001). Rambus contends that its document retention policy is fairly typical and in accordance with the general standards applicable to such programs.

In support of these contentions, Rambus quotes from a slide presentation that Karp gave to Rambus employees immediately before Shred Day. These slides instruct employees that, *inter alia,* documents designated as containing trade secret information should be retained for the life of the trade secret, that personnel records should be kept for a period of three years, and that employees should "LOOK FOR THINGS TO KEEP" and to "LOOK FOR REASONS TO KEEP IT." Pls. Ex. 2. Rambus correctly argues that these instructions are fairly standard for document retention systems.

In addition, although Rambus does not dispute the fact that it destroyed documents because of their "discoverability," it argues that Infineon has misunderstood the true nature of Rambus' concerns. Rambus argues that, in the late 1990s, Karp and other Rambus executives became concerned that Rambus was keeping far too many documents and that, if Rambus was ever asked to produce documents in discovery or as the result of a third-party subpoena, it would require vast resources to sift through the materials.[29] For instance, Karp testified under oath that:

> [M]y concern was that if I was ever asked to produce these thousands of back-up tapes, regardless of what they concerned—they did not just contain e-mail, they contained everything—that it would be a task that would be beyond the human endurance to try to figure out what was on those things.

Pls. Ex. 6. In addition, Richard Barth, a former Rambus employee who testified at

---

29. Rambus, however, has not shown how it might have been exposed to litigation that would have called for production of documents other than the patent litigation which it was itself formulating as early as 1998.

deposition regarding the document retention policy and Shred Day, stated:

> I don't recall [Karp] being so much worried about documents that were harmful to Rambus in that it would reveal you know, some dastardly secret. What I do remember is that, yeah, we are pack rats and the amount of stuff that we had was enormous. And the concern was that if we had to go and grind through all that and produce it, it would just kill us. We'd get no engineering done. All our resources would be consumed by plowing through old stuff.

Pls. Ex. 7. *Compare with Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 481 (S.D.Fla. 1984) ("The stated purpose of the [document retention program] was the elimination of documents that might be detrimental to Piper in a lawsuit."). Thus, although Rambus admits that it instituted its document retention policy out of discovery-related concerns, it contends that these concerns were related to the legitimate purpose of reducing search and review costs, not for the purpose of eliminating potentially-damaging documents that a future adversary might discover. *See* Christopher Cotton, *Document Retention Programs for Electronic Records: Applying a Reasonableness Standard to the Electronic Era*, 24 J. Corp. L. 417, 421 n. 32 (1999) ("The occasional presence of a 'smoking gun' in documents produced is not what motivates a business to implement a document retention and destruction program. Rather, it is the administrative burden and cost of searching through mounds of paper and electronic files in response to each request.") (internal citations and quotations omitted).

 Although Rambus has presented evidence that, in concept, it structured its document retention program like a lawful program and that it had some valid reasons for adopting its policy, these arguments tend to ignore the vital question at issue: whether Rambus intentionally destroyed documents notwithstanding that it anticipated litigation. In other words, even if it was merely instituting a valid purging program, even valid purging programs need to be put on hold when litigation is "reasonably foreseeable." *Silvestri*, 271 F.3d at 590; *see also Thompson*, 219 F.R.D. at 100. Thus, even if Rambus did not institute its document retention policy in bad faith, if it reasonably anticipated litigation when it did so, it is guilty of spoliation.

As noted above, the record here already contains some findings of fact relevant to that issue. For example, in resolving Infineon's 2001 post-trial motion for attorney's fees, the Court stated that:

> [T]he record in this case shows that Rambus implemented a "document retention policy," in part, for the purpose of getting rid of documents that might be harmful in litigation. Rambus instituted its document retention policy in 1998. Clearly, *Rambus contemplated that it might be bringing patent infringement suits during this timeframe* if its licensing efforts were not successful—its Business Plan unequivocally states that the issuance of JEDEC-related patents would put it in a position to demand royalties from semi-conductor manufacturers. Rambus executive Allen Roberts testified that one of the reasons for the document destruction was that the documents might be discoverable in future litigation, although he also stated that the policy was just a "house-keeping thing."

*Rambus, Inc.*, 155 F.Supp.2d at 682 (emphasis added). Thus, the Court has already found, as a matter of fact, that Rambus anticipated litigation when it instituted its document retention program.

The FTC proceedings have also resulted in conclusions pertinent to this issue. In the FTC proceedings, the ALJ denied the FTC's request for summary judgment based on Rambus' destruction of evidence but imposed sanctions (in the form of adverse inferences and rebuttable presumptions) because of Rambus' document destruction. In so doing, the ALJ held:

> Here, all credible evidence indicates that Rambus knew or should have known that it could reasonably anticipate litigation concerning patent infringement from the proposed JEDEC standards for RAM.... Certainly by the time Rambus chose to commence its document retention programs in 1998, it knew or reasonably could anticipate RAM-related litigation.

Def. Ex. 30, at 6. This finding, of course, also supports Infineon's contentions.

Moreover, Rambus' privilege log illustrates that Rambus was developing both a patent litigation strategy and its document retention program *at the same time.* For instance, privilege log entry numbers 319 and 320, which reflect memorandum written in early 1998 from Rambus' in-house legal department to Karp, establish that Rambus was developing "strategy" in "anticipation of litigation," at the very same time that it was developing its document purging system. Thus, Rambus clearly anticipated some type of litigation at the point it destroyed documents.[30]

Infineon also points to a recently disclosed internal Rambus document created by Rambus' intellectual property team in June 1999 that discusses the company's goals for 1999. *See* Def. Ex. 40. Under a heading entitled "Infringing Devices," Rambus' intellectual property goals included:

- Initiate reverse engineering of infringing devices as required for litigation prep.

Under the heading "Licensing/Litigation Readiness," the company's goals, *inter alia,* were:

- Prepare licensing positions against 3 manufacturers
- Prepare litigation strategy against 1 of the 3 manufacturers (re: 3D)
- Ready for litigation with 30 days notice
- Organize 1999 shredding party at Rambus

Def. Ex. 40. Thus, Infineon has presented evidence that, taken together, rather strongly indicates that Rambus explicitly linked

development of its document retention policy and the shredding of documents with preparing for patent litigation.[31]

It is not entirely clear, however, that the sought-after documents bear a close relationship to Rambus' spoliation scheme. *Chaudhry,* 174 F.3d at 403. Infineon, however, has presented evidence sufficient to support a reasonable belief that a review of the at-issue documents themselves may yield evidence that establishes the applicability of the crime/fraud exception. *United States v. Zolin,* 491 U.S. 554, 574–75, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). Moreover, when reviewing the first 10 volumes (of 48 volumes) of privileged documents *in camera* as part of the effort to ascertain the adequacy of Rambus' privilege log, the Court noticed several documents that support Infineon's position and bolster the showing it has made on the basis of what it knows to date.

The Court, therefore, will conduct an *in camera* review of the privileged documents to determine whether the documents themselves give rise to a prima facie case of spoliation sufficient to support application of the crime/fraud exception. *Zolin,* 491 U.S. at 574–75, 109 S.Ct. 2619; *In re Grand Jury Proceedings,* 33 F.3d 342, 350 (4th Cir.1994). The Court will review, *inter alia,* those documents reflected on the privilege log in which Rambus discusses its patent litigation strategy in an attempt to ascertain whether Rambus was reasonably anticipating litigation with DRAM-technologies manufacturers at the point it was developing its document

---

30. Rambus submits that, before a court can find spoliation, it must find that the alleged spoliator reasonably anticipated litigation with the specific party who later alleges the spoliation. Indeed, most of the decisional law discussing spoliation involves a situation wherein the spoliating party anticipated litigation with the very party that later accuses it of spoliation. No case, however, expressly states that the would-be spoliator must anticipate litigation with the specific party who later brings the suit; rather, it just stands as a matter of logic that if a company is on notice that litigation is likely to ensue, that the company will realize, at least on a broad level, who the anticipated litigation will involve.

31. Moreover, substantive entries on Rambus' privilege log are relevant to this topic. For instance, entry number 315 on Rambus' privilege

log documents an entry reflecting legal advice pertaining to the legal strategy for enforcement of Rambus' patents. Rambus has claimed both the attorney-client and work product privileges for this document. The work product privilege, however, by definition does not apply unless the document was created in "anticipation of litigation." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., Inc.,* 967 F.2d 980, 984 (4th Cir.1992). Notably, the document reflected at entry number 315 was created in March 1998, the same timeframe in which Rambus was developing its document retention program. Thus, if, as Rambus claims, the document truly was created in anticipation of litigation, that fact would also tend to support a finding of spoliation.

retention policy.[32] Thus, Infineon's motion to compel will be retained under consideration pending completion of an *in camera* review.

## B. Application of the Subject–Matter Waiver Rule

Next, Infineon argues that, because Rambus has voluntarily divulged the substantive components of its document retention policy, Rambus must disclose any documents respecting the policy that would otherwise be protected by the attorney-client privilege. In other words, Infineon seeks application of the subject-matter waiver rule. *See Sheet Metal Workers Int'l Assoc. v. Sweeney*, 29 F.3d 120, 125 (4th Cir.1994); *United States v. Jones*, 696 F.2d 1069, 1072–73 (4th Cir.1982) (per curiam).

As noted above, in 1998 Karp requested legal assistance from an outside law firm in creating and implementing a document retention program. From this advice, Karp formulated a document retention policy, which is reflected in a short memorandum he prepared for general consumption at Rambus. During deposition, Karp testified: "I drafted the ultimate one or two-page policy that basically was the result of the policies I got from [Cooley Godward, LLP]." Def. Ex. 37. Karp thereafter distributed this memorandum to Rambus employees and, in July 1998, Rambus held company-wide meetings regarding the document retention policy at which time Karp explained the policy to Rambus employees.

Subsequently, Rambus has voluntarily produced Karp's document retention policy memorandum in this litigation, as well as in the litigation with Micron. Furthermore, during depositions in this case, Karp himself testified somewhat about the substantive components of the document retention policy, testifying about, *inter alia*, the document retention policy's protocols for e-mail retention. *See* Def. Ex. 37. Lester Vincent, Rambus' former patent prosecution counsel, also testified at deposition regarding the substantive contours of Rambus' document retention

policy. *See* Def. Ex. 41. Rambus has also voluntarily disclosed the slide presentation that Karp and other Rambus managers showed to Rambus employees respecting the document retention program. Further, these other Rambus employees have also testified as to the substantive contours of the document retention policy. For instance, Jeff Mitchell, a Rambus employee, testified to such subjects during his deposition. *See* Def. Ex. 42. Moreover, Rambus has voluntarily produced the notes that Rambus' Consumer and Communication Products Division Head, Kevin Donnelly ("Donnelly") took during the July 1998 company-wide meetings respecting the document retention policy. *See* Def. Ex. 39. In these notes, Donnelly describes the substance, content, and protocols of the document retention policy.

 Rambus, therefore, has disclosed the substance of its document retention policy. In addition, Karp and others have testified as to some of the reasons for adopting the policy and, to some extent, how the policy was implemented. Because the Fourth Circuit has held that voluntary disclosure not only waives the privilege as to the specific information disclosed, but also waives the privilege as to any other documents pertaining to the same *subject matter* of the disclosure, *see Sweeney*, 29 F.3d at 125; *Jones*, 696 F.2d at 1072, Rambus has potentially waived its privilege over certain material it is currently withholding.

The Fourth Circuit holds that the scope of the subject-matter waiver rule is limited to "other communications relating to the same subject matter." *Jones*, 696 F.2d at 1072; *see also Hawkins*, 148 F.3d at 384 n. 4. This, of course, leaves open for interpretation what exactly constitutes the "same subject matter." Indeed: "Despite the centrality of the term, 'same subject matter,' to this inquiry, courts have not defined its meaning and content precisely." *United States v. Skeddle*, 989 F.Supp. 917, 919 (N.D.Ohio 1997) (collecting cases); *see also* Jennifer A. Hardgrove, *Note, Scope of Waiver of Attorney–Client Privilege: Articulating a Standard*

---

**32.** Infineon also moves for permission to conduct additional depositions respecting Rambus' document retention policy. If, after conducting the *in* *camera* review, the Court finds a prima facie case of spoliation, it will address Infineon's request for additional depositions at that time.

*That Will Afford Guidance to Courts,* 1998 U. Ill. L.Rev. 643, 662 (1998) (noting that few courts have "developed a specific list of criteria to apply when determining the appropriate breadth of waiver; instead courts seem to analyze each case on an ad hoc basis"). Although the Fourth Circuit has not developed a precise test for determining what constitutes "the same subject matter," it has suggested that the term should be interpreted narrowly, stating that in order to fall under the scope of the subject-matter waiver rule, the other documents must "be *directly related* to the [disclosed subject]." *United States v. (Under Seal),* 748 F.2d 871, 875 n. 7 (4th Cir.1984) (emphasis added). Several other courts have reached similar results. *See In re Grand Jury Proceedings,* 78 F.3d 251, 255–56 (6th Cir.1996) (defining scope of subject-matter waiver rule narrowly, basing inquiry on fact specific prudential concerns); *In re United Mine Workers of Am. Employee Benefit Plans Litig.,* 159 F.R.D. 307, 309 (D.D.C.1994) (stating that same subject matter is appropriately limited to other communications respecting the same *specific* subject matter).

 In *Skeddle,* the court listed several flexible non-exhaustive factors that, depending on the specific circumstances presented, may be pertinent in determining whether disclosed communications and undisclosed communications relate to the same subject matter:

> (1) [T]he general nature of the lawyer's assignment; (2) the extent to which the lawyer's activities in fulfilling that assignment are undifferentiated and unitary or are distinct and severable; (3) the extent to which the disclosed and undisclosed communications share, or do not share, a common nexus with a distinct activity; (4) the circumstances in and purposes for which disclosure originally was made; (5) the circumstances in and purposes for which further disclosure is sought; (6) the risks to the interests protected by the privilege if further disclosure were to occur; and (7) the prejudice which might result if disclosure were not to occur.

*Skeddle,* 989 F.Supp. at 919; *see also SNK Corp. of Am. v. Atlus Dream Entm't Co.,*

*Ltd.,* 188 F.R.D. 566, 571 (N.D.Cal.1999) (stating that in determining scope of any subject matter waiver, courts must be "guided by 'the subject matter of the documents disclosed, balanced by the need to protect the frankness of the client disclosure and to preclude unfair partial disclosures' ") (quoting *Starsight Telecast, Inc. v. Gemstar Dev. Corp.,* 158 F.R.D. 650, 655 (N.D.Cal.1994)). An application of these precepts suggests that Rambus has waived the attorney client privilege as to any documents that contain information about or relate to the creation, preparation, or scope of its document retention policy, and, perhaps, even as to any documents that pertain to Rambus' patent litigation strategy.

 To begin, and as explained previously, Karp "drafted the ultimate one or two-page [document retention] policy ... as a result of the policies [he] got from [Cooley Godward, LLP]." Def. Ex. 37. By widely distributing this policy to third parties through document production and depositions, Rambus has disclosed the substance of the policy and, in so doing, has disclosed the substance of the opinions and advice it received from Cooley Godward, LLP. In so doing, Rambus arguably has waived the attorney-client privilege as to any documents that pertain to the advice it received respecting the scope of its document retention policy.

Such documents share a common nexus with the disclosed information, specifically, the disclosed information is merely a synthesis of the communications contained in the undisclosed documents. *Skeddle,* 989 F.Supp. at 919. Moreover, disclosure of these documents would not risk interfering too greatly with the attorney-client privilege because their substance has, to a large extent, already been revealed. *Id.* In addition, because the disclosed information was taken directly from them, the documents reflecting the legal advice received from Cooley Godward, LLP are "directly related" to the already disclosed information. *(Under Seal),* 748 F.2d at 875 n. 7; *see also Jones,* 696 F.2d at 1072–73 (finding that when corporate official distilled advice received in confidential attorney-client communications into

document made available for general consumption, corporation waived any claim of attorney-client privilege as to actual communications).

The foregoing appears to provide a basis for concluding that Rambus has waived the otherwise privileged subjects of the content of its document retention policy and how the program was implemented. It, however, is appropriate to complete the *in camera* review of the privileged documents before deciding the issue of waiver. In other words, because the Court is already conducting an *in camera* review of the documents in order to determine whether the documents contain information relevant to the spoliation issue, the Court will, at this time, forego ruling on the precise impact of any waiver as respects documents that contain information about or relate to the creation, preparation, or scope of Rambus' document retention policy.

As explained above in discussing spoliation, many of the documents described on Rambus' privilege log discuss Rambus' development of a legal strategy for enforcement of its intellectual property. These documents, as noted above, illustrate that Rambus was developing a litigation strategy for patent enforcement during the same time that it was instituting its document retention plan. The text of one document, submitted by Infineon as Exhibit 40, rather strongly indicates that Rambus' document retention policy was part-and-parcel of its intellectual property and litigation strategy. Arguably, therefore, because Rambus has disclosed information respecting the substance of its document retention policy, it has also waived the privilege with respect to those documents that pertain to its patent litigation strategy.

Moreover, some of the documents that the Court has reviewed *in camera* in assessing the issues respecting the adequacy of Rambus' privilege log also point to the same conclusion. And, some of those documents bear on the accuracy of assertions made by some of Rambus' witnesses respecting why the document retention policy was adopted and how it was implemented. Having allowed testimony about the reasons for creating the document retention program and how it was implemented, it is arguable that Rambus cannot, under claims of privilege, restrict access to documents that address those topics. It, however, is appropriate to complete an *in camera* review of the privileged documents before deciding the issue of waiver. As noted above, because the Court will be reviewing these documents *in camera* in an effort to determine the existence of spoliation and whether the crime/fraud exception should apply, if the documents reflect that document destruction was part-and-parcel of Rambus' litigation strategy, the review will also provide meaningful guidance for determining the scope of any waiver that such a finding would create.[33]

### CONCLUSION

For the reasons stated above, the Motion to Compel Production of Documents Listed on Rambus' Privilege Log of Infineon (Docket No. 490) is GRANTED IN PART and DENIED IN PART. Because, as a matter of law and fact, Rambus' privilege log is insufficient, Rambus already has been ordered to file an adequate log. Infineon's request for an order finding a waiver of all privileges by virtue of the inadequacy will be denied. Because it voluntarily disclosed the documents, and because those documents should have been disclosed before the first trial in this action, Rambus will be ordered to produce to Infineon any documents it produced in the

---

33. This approach is further appropriate because of the nature of the privileges that Rambus has invoked to protect the documents related to its patent enforcement litigation strategy. With respect to many of these documents, Rambus claims both the attorney-client and work product privileges, *e.g.*, entry numbers 315, 317, 319, and 342 on its privilege log. The effect of the subject-matter waiver rule on the work product privilege, however, is quite different than its effect on the attorney-client privilege. *Federal Election Comm'n v. Christian Coalition*, 178 F.R.D. 61, 77 (E.D.Va.1998). Indeed, the subject-matter waiver rule is much less sweeping as respects the work product privilege than the attorney-client privilege. *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1222–23 (4th Cir.1976); *Christian Coalition*, 178 F.R.D. at 77. This further counsels against compelling Rambus to disclose the documents pertaining to its patent enforcement litigation strategy until after the appropriateness of such an order is revealed by the *in camera* review.

*Hynix* or FTC litigations that are covered by the March 7 Order. Finally, Rambus will also be ordered to produce the twenty-seven documents that fall within the reach of the March 7 Order that Rambus has never disclosed previously. The Motion to Compel Production of Documents Relating to Rambus' Document Retention Policy of Infineon (Docket No. 492) is RETAINED UNDER CONSIDERATION pending completion of the *in camera* review.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.